## UNITED STATES *v.* W. T. GRANT CO. ET AL.

No. 532. Argued April 9, 1953.—Decided May 25, 1953.

*Victor H. Kramer* argued the cause for the United States. With him on the brief were *Acting Solicitor General Stern, Acting Assistant Attorney General Hodges* and *Daniel M. Friedman.*

*Eustace Seligman* argued the cause for Hancock et al., appellees. With him on the brief was *Howard T. Milman.*

*Abe Fortas* argued the cause for the Kroger Company, appellee. With him on the brief was *Norman Diamond.*

*Samuel J. Silverman* was on the Statement Opposing Jurisdiction and Motion to Dismiss or Affirm.

*Harry H. Wiggins* and *Harman Hawkins* submitted on brief for S. H. Kress & Co., appellee.

MR. JUSTICE CLARK delivered the opinion of the Court.

For the first time since the enactment of the Clayton Act in 1914 the Court is called upon to consider § 8's prohibitions against interlocking corporate directorates.[1] The Government appeals from judgments dismissing civil actions brought against Hancock and three pairs of corporations which he served as a director, W. T. Grant Co. and S. H. Kress & Co., Sears Roebuck & Co. and Bond Stores, Inc., and Kroger Co. and Jewel Tea Co., Inc. Alleging that the size and competitive relationship of each set of companies brought the interlocks within the reach of § 8, the complaints asked the court to order the particular interlocks terminated and to enjoin future violations of § 8 by the individual and corporate defendants. Soon after the complaints were filed, Hancock resigned from the boards of Kress, Kroger and Bond. Disclosing the resignations by affidavit, all of the defendants then moved to dismiss the actions as moot. Treated as motions for summary judgment,[2] they were granted by the District Judge. He concluded that there is not "the

---

[1] "SEC. 8. . . .

"No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, . . . if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. . . ." 38 Stat. 730, 15 U. S. C. § 19.

[2] Fed. Rules Civ. Proc. 12 (b) (6), 56.

slightest threat that the defendants will attempt any future activity in violation of Section 8 [if they have violated it already] . . . ." 112 F. Supp. 336, 338. The Government brought this direct appeal under § 2 of the Expediting Act, 32 Stat. 823, as amended, 62 Stat. 989, 15 U. S. C. (Supp. V) § 29, contending that the cases were not rendered moot by Hancock's resignations and that it was an abuse of discretion for the trial court to refuse any injunctive relief.

Appellees suggest, without arguing the point *in extenso,* that the judgment should be affirmed because § 11 of the Clayton Act vests exclusive § 8 enforcement powers in the Federal Trade Commission.[3] Section 11 does authorize the Commission to enforce § 8. But any inference that administrative jurisdiction was intended to be exclusive falls before the plain words of § 15: "The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this

---

[3] "SEC. 11. That authority to enforce compliance with sections 2, 3, 7, and 8 of this Act by the persons respectively subject thereto is hereby vested . . . in the Federal Trade Commission where applicable to all other character of commerce to be exercised as follows:

"Whenever the Commission . . . shall have reason to believe that any person is violating or has violated any of the provisions of sections 2, 3, 7, and 8 of this Act, it shall issue and serve upon such person and the Attorney General a complaint stating its charges in that respect, and containing a notice of hearing . . . . If upon such hearing the Commission . . . shall be of the opinion that any of the provisions of said sections have been or are being violated, it shall make a report in writing, in which it shall state its findings as to the facts, and shall issue and cause to be served on such person an order requiring such person to cease and desist from such violations, and divest itself of the stock, or other share capital, or assets, held or rid itself of the directors chosen contrary to the provisions of sections 7 and 8 of this Act, if any there be, in the manner and within the time fixed by said order. . . ." 64 Stat. 1126, 15 U. S. C., Supp. V, § 21.

Act . . . ." 38 Stat. 736, 15 U. S. C. § 25.. And the cases have spoken of Congress' design to provide a scheme of dual enforcement for the Clayton Act. *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196, 208 (1945); *Standard Oil Co.* v. *United States,* 337 U. S. 293, 310, note 13 (1949). Appellees' failure to press the point denotes its merits. The District Court properly entertained the suits.

Both sides agree to the abstract proposition that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i. e.,* does not make the case moot. *United States* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290 (1897); *Walling* v. *Helmerich & Payne, Inc.,* 323 U. S. 37 (1944); *Hecht Co.* v. *Bowles,* 321 U. S. 321 (1944). A controversy may remain to be settled in such circumstances, *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 448 (1945), *e. g.,* a dispute over the legality of the challenged practices. *Walling* v. *Helmerich & Payne, Inc., supra; Carpenters Union* v. *Labor Board,* 341 U. S. 707, 715 (1951). The defendant is free to return to his old ways.[4] This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion. *United States* v. *Trans-Missouri Freight Assn., supra,* at 309, 310. For to say that the case has become moot means that the defendant is entitled to a dismissal as a matter of right, *Labor Board* v. *General Motors Corp.,* 179 F. 2d 221 (1950). The courts have rightly refused to grant defendants such a powerful weapon against public law enforcement.[5]

---

[4] Cf. *United States* v. *Hamburg-Amerikanische Packetfahrt-Actien Gesellschaft,* 239 U. S. 466 (1916).

[5] "When defendants are shown to have settled into a continuing practice or entered into a conspiracy violative of antitrust laws, courts will not assume that it has been abandoned without clear proof. . . . It is the duty of the courts to beware of efforts to defeat

The case may nevertheless be moot if the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated." [6] The burden is a heavy one. Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts.

Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. *Hecht Co.* v. *Bowles, supra; Goshen Mfg. Co.* v. *Myers Mfg. Co.,* 242 U. S. 202 (1916). The purpose of an injunction is to prevent future violations, *Swift & Co.* v. *United States,* 276 U. S. 311, 326 (1928), and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.

The facts relied on by the Government to show an abuse of discretion in this case are these: Hancock's three interlocking directorates viewed as three distinct violations, his failure to terminate them until after suit was

injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States* v. *Oregon State Medical Society,* 343 U. S. 326, 333 (1952).

[6] *United States* v. *Aluminum Co. of America, supra,* at p. 448.

filed despite five years of administrative attempts to persuade him of their illegality, his express refusal to concede that the interlocks in question were illegal under the statute and his failure to promise not to commit similar violations in the future.

Were we sitting as a trial court, this showing might be persuasive. But the Government must demonstrate that there was no reasonable basis for the District Judge's decision.[7] In this we think it fails. An individual proclivity to violate the statute need not be inferred from the fact that three violations were charged, particularly since it is only recently that the Government has attempted systematic enforcement of § 8.[8] The District Court was not dealing with a defendant who follows one adjudicated violation with others. The only material before the District Judge on the supposed five years of administrative persuasion could easily support an inference that during that time the defendant and the Department of Justice were each trying to determine the legality of his directorships. The Government's remedy under the statute was plain. Postponement of suit indicates doubt on the prosecutor's part as much as intransigence on the defendant's. How much contrition should be expected of a defendant is hard for us to say. This surely is a question better addressed to the discretion of the trial court. The same can be said of the limited disclaimer of future intent.

Assuming with the Government that the corporations were properly joined as defendants,[9] the conclusion that there was no abuse of discretion in refusing injunctive relief against Hancock applies *a fortiori* in their case.

---

[7] Cf. *United States* v. *United States Gypsum Co.*, 340 U. S. 76, 89 (1950), on review of particular antitrust decree provisions.

[8] See Kramer, Interlocking Directorships and the Clayton Act After 35 Years, 59 Yale L. J. 1266.

[9] We should not be understood as deciding whether corporations can violate § 8 or, for other reasons, be enjoined under the statute.

None of the corporations appeared to have engaged in more than one alleged violation. And affidavits filed with the motions to dismiss indicated that these defendants were ignorant of the Government's interest in the interlocks until the suits were filed. Indeed the emphasis on this branch of the case is placed on the refusal of relief against Hancock. The failure to point to circumstances compelling further relief against the corporations speaks for itself.

Essentially, the Government's claim is that it was deprived of a trial on the relief issue. But at no time was objection raised to the procedure by which the case was handled. Of course summary judgment procedure could not have been employed were there a "genuine issue as to any material fact." Fed. Rules Civ. Proc. 56. However, after the defendants had moved to dismiss, the Government elected not to file any countervailing affidavits or amend its complaint and stated on oral argument that the truth of the defendants' affidavits was not questioned. To frame a factual dispute, that left the complaint, the only relevant paragraph of which reads: "16. The defendants have threatened to continue and will continue *the aforesaid violation* of Section 8 of the Clayton Act unless the relief prayed for herein is granted." (Emphasis added.) "The aforesaid violation[s]," the specific interlocks, had been voluntarily terminated and intention to resume them had been negatived under oath. As to the prayer that the defendants be enjoined from any future violations of § 8, the complaint alleged no threatened violations other than those specifically charged. In these circumstances, the District Judge could decide that there was no significant threat of future violation and that there was no factual dispute about the existence of such a threat.

We conclude that, although the actions were not moot, no abuse of discretion has been demonstrated in the trial

court's refusal to award injunctive relief.   Moreover, the court stated its dismissals "would not be a bar to a new suit in case possible violations arise in the future."   The judgments are

*Affirmed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

Monopoly and restraints of trade are sometimes the products of practices and devices as ingenious as the minds of men.   Sometimes they follow a blunt and direct course as is involved in the acquisition of the assets of a competitor—a way of growth of monopoly power to which the decisions of the Court have given a powerful impetus and encouragement.   See especially *United States* v. *Columbia Steel Co.,* 334 U. S. 495.   More subtle are interlocking arrangements between directorates. This can accomplish disastrous consequences, as Mr. Justice Brandeis pointed out forty years ago.   Interlocking directorates between companies which compete stifle the competition.   Or to use the words of Mr. Justice Brandeis, the practice substitutes "the pull of privilege for the push of manhood." [1]   Moreover, those entwined relations are the stuff out of which concentration of financial power over American industry was built and is maintained.   Mr. Justice Brandeis gave one example: [2]

"They, the bankers, control the railroads, and controlling the railroads, they were able to control the issue and sale of securities.   Being bankers, they bought those securities at a price which they had a

[1] See Brandeis, The Endless Chain, Harper's Weekly, Dec. 6, 1913, p. 13, quoted in Lief, The Brandeis Guide to the Modern World, p. 111.

[2] See his testimony in Hearings, H. R. Committee on the Judiciary, 63d Cong., 2d Sess., on Trust Legislation, vol. 2, p. 922, quoted in Lief, *op. cit., supra,* note 1, p. 113.

part in fixing or could have a part in fixing. They sold those securities, as bankers, to insurance companies in which they were able to exercise some control as directors. They got the money with which to buy those securities from railroads through their control of the great banking institutions, and then, in their capacity of having control of the railroads, they utilized that money to purchase from great corporations, like the Steel Corporation, what the railroads needed, and in their capacity as controlling other corporations they bought from the Steel Corporation again, and so on until we had the endless chain."

The web that is woven may tie many industries, insurance companies, and financial houses together into a vast and friendly alliance that takes the edge off competition.

That condition is aggravated here. The interlocking control in the present case is not indirect. Mr. Hancock served as a director for each of three sets of companies which, on the state of the pleadings before us, we must assume to have been competitive. The fact that he resigned under the pressure of these proceedings should not dispose of the case. We are dealing here with professionals whose technique for controlling enterprises and building empires was fully developed and well known long before Mr. Justice Brandeis was crying out against the evils of "the money trust." Mr. Hancock is and has been for some years a partner in the investment banking firm of Lehman Bros. In 1940 he testified that when Lehman Bros. did financing for a company it was their "traditional practice" to ask for representation on the board of directors.[3]

It therefore seems to me that a District Judge, faced with violations such as were involved here, would want

---

[3] Hearings, Temporary National Economic Committee, 76th Cong., 3d Sess., Pt. 24, p. 12400.

to know *first,* how investment bankers built their empires; *second,* how this particular firm built its own empire; *third,* the effect of these banker empires on competition between the companies which are tied to them.

The fact that the Lehman partner resigned to avoid a decision on the merits has little, if any, relevancy to the issue in the case, for we are here concerned with the *proclivity* of the house to indulge in the practice.

The relevant issues have never been weighed in this case. The District Court's ruling would be entitled to a presumption of validity if those various factors had been considered. But the District Court made no such considered judgment. It disposed of the case on the basis of mootness, a ruling now conceded to be erroneous. The case should go back for a consideration of the nature and extent of the web which this investment banking house has woven over industry and its effect on the "elimination of competition" within the meaning of § 8 of the Clayton Act.[4] Unless we know that much, we are in no position to judge the service an injunction against future violations may do. Unless we know that much, we are in no position to carry out Woodrow Wilson's policy expressed in § 8 of the Clayton Act that those interlocking directorates should be prevented which make "those who affect to compete in fact partners and masters of some whole field of business." Message, Joint Session of the Houses of Congress, Jan. 20, 1914.

---

[4] In *United States* v. *Sears, Roebuck & Co.,* 111 F. Supp. 614, 616, decided April 28, 1953, the court ruled that Congress intended by § 8 "to nip in the bud incipient violations of the antitrust laws by removing the opportunity or temptation to such violations through interlocking directorates."