**Reed JOHNSTON, Regional Director for the Eleventh Region of the National Labor Relations Board, Petitioner,**

v.

**J. A. HACKNEY & SONS, INC., Respondent.**

**Civ. No. 675.**

United States District Court
E. D. North Carolina,
Washington Division.

March 26, 1969.

---

1. Both *McCarthy* and *Halliday* construed Rule 11; as amended July 1, 1966.

Jesse L. Butler, Atty., N.L.R.B., Winston-Salem, N. C., for petitioner.

J. D. Grimes, Washington, N. C., Robert L. Thompson, of Constangy & Prowell, Atlanta, Ga., for respondent.

## SUMMARY

LARKINS, District Judge.

This proceeding comes before the Court as a Petition filed October 31, 1968, by the Regional Director of the Eleventh Region of the National Labor Relations Board, on behalf of the Board, pursuant to Section 10(j) of the National Labor Relations Act, as amended (61 Stat. 149; 73 Stat. 544; 29 U.S.C.A. § 160(j)), seeking an interlocutory injunction pending final disposition of the matters involved herein pending before the Board. The Petition was filed after issuance of a Complaint and Notice of Hearing pursuant to Section 10(b) of the Act based upon charges filed by the International Chemical Workers Union, AFL-CIO. The Board Complaint alleges that Respondent, J. A. Hackney & Sons, Inc., has engaged in and is engaging in conduct violative of Section 8(a) (1) and (3) of the Act. Specifically, Petitioner contends that Respondent has unlawfully engaged in interrogation, threats, etc. and thereby has interfered with, restrained and coerced its employees in the exercise of rights guaranteed them in Section 7 of the Act and has discriminatorily discharged 41 employees for their activities on behalf of and membership in the Union. The Petition is predicated upon the allegation that the Regional Director has "reasonable cause to believe" that Respondent has engaged in and is engaging in the unfair labor practices alleged in the Complaint. Respondent has denied having engaged in such activity in violation of employees' rights under Section 7 and contends that all the discharges were motivated by economic necessity.

Respondent is engaged within this judicial district in transacting business, and jurisdiction is thereby conferred by Section 10(j) of the Act. A hearing on the issues raised by the Petition and Answer was held by this Court on November 5 and November 22, 1968. A hearing on the merits of the Complaint was held before a duly authorized Trial Examiner of the National Labor Relations Board on November 12 through November 15, 1968. In his decision rendered January 24, 1969, the Trial Examiner concluded that Respondent had committed a number of unfair labor practices and submitted a recommended Order to the Board on the basis of his findings of fact.

## FACTS

Hearings before this Court and the Trial Examiner revealed the following facts:

Respondent, a North Carolina corporation, is engaged in the business of manu-

facturing truck bodies for the beer and soft drink industries. It has undergone considerable growth in the last few years, its sales increasing from $1.5 million in 1964 to $2.83 million in 1967. In 1968, however, the company expected to drop back to $2 million in sales. Its customers, bottlers and distributors of beer and soft drinks, are engaged in what is mainly a seasonal business. Most of their orders for new truck bodies are placed in the winter so that the trucks will be ready for use at the beginning of their season. However, in February, 1968, a strike in the glass industry caused a downturn in the bottling industry which, in turn, caused a marked drop in the number of orders for truck bodies received by Respondent. Consequently, on April 23, 1968, Hodges Hackney, Respondent's sales manager, prepared and presented to Respondent's managers a sales projection in which he revised downward earlier estimates of Respondent's sales and production needs between April 28 and the end of August, the period covered by his study. He pointed out that orders received in the January-April period were down $251,578 from 1967 and that, for Respondent to keep abreast of its original 1968 budget, his salesmen would have to write new orders in the amount of $983,749. He said it was his opinion, however, that they would sell only $673,400 worth. The latter figure was based on his forecast of selling 259 bodies, or an average of 14.5 per week for the 18-week period under review. Respondent's backlog of unfilled orders at the time was $1,669,539, and its production capacity was 30 bodies per week. Hodges Hackney kept a running record of how his projection compared with reality.

The Union's campaign to organize Respondent's employees began with a meeting on the evening of May 21, 1968. Joe Cutler became head of an employee organizing committee, and James Edwards became its secretary. James A. Hackney III, Respondent's executive vice president and general manager, learned of the campaign on the evening of May 22 when employee Guy Edwards called him at home to tell him about the meeting. On May 23, James Hackney III assembled Respondent's employees and addressed them at length about Respondent's and their prospects in light of the Union's campaign. He also discussed the alarming downward trend in productivity and implied that there would have to be a layoff or a reduction in working hours if the backlog of orders did not increase. He pointed out that the backlog was less than half of what it had been a year earlier, but he did not announce any decision to discontinue the present level of production.

Also, on May 23 employee Chester Webb informed Holmes Boyd, Respondent's production superintendent, and his assistant, Melville Russ, that the Union was attempting to organize the plant. It was arranged that Webb would attend a Union meeting scheduled for that night and report back. Union meetings were held on May 23, May 30, and June 5. Webb and Edwards reported to Respondent the names of employees attending Union meetings.

On May 27, 28, and 29, James Hackney III addressed the employees in several small groups on the subject of unions. He told them that they should not select a union as their bargaining agent and gave a number of reasons why he thought so. He told them that they should not believe a union organizer who told them that they had to sign an authorization card in order to protect their jobs and assured them that no employee would receive any special privileges or be treated any differently because he might be serving in some capacity with a union, or was a member of a union. He reminded the employees of the benefits they were then receiving and the good relationship that then existed between the company and the employees. He invited questions, and employees voiced complaints about their wages and Respondent's job progression plan.

James A. Hackney, Jr., Respondent's president, ran for county commissioner in a local election held the first week in

June. During the last week in May campaign buttons which read "I'm For Hackney" were made available in the plant. Several employees altered the buttons to read "I'm For Hackney Union" and wore them. Evidence was presented at the hearing before the Trial Examiner that the names of employees who wore the altered buttons were written down and reported to James Hackney III.

During the week ending June 25, Respondent reduced its normal workweek from 50 to 45 hours. On June 28 James Hackney III decided to discharge enough employees to reduce the work force to the size required to produce approximately 14.5 bodies per week. On that day Hodges Hackney's running record of projected sales versus actual sales showed a projected figure for the week ending June 25 of 130.5 bodies, actual sales of 135 bodies. On July 1 James Hackney III sent a memorandum to production superintendent Boyd in which he asked him to come up with a systematic plan for reducing each department to the number of employees needed to produce 14.5 bodies per week.

Since 1965, when James Hackney III took over from his father as Respondent's operating head, Respondent has rated all of its employees twice a year. A form is used on which each employee is rated in eight categories such as quality of work and productiveness on a numerical scale which ranges from four for excellent to zero for poor. The ratings are added to give the man's score. The average departmental score for each category and the average composite score are also entered on the sheet so that the man's standing relative to the departmental average can be ascertained at a glance. The rating foreman's score may be adjusted up or down by his superior by a maximum of one point.

In response to James Hackney III's memorandum, Boyd recommended, and Hackney approved, the following systematic plan for selecting employees for discharge: Each man's deviation from the composite departmental average in the two most recent ratings was noted and

the two deviations averaged. An average deviation of 1.2 was arbitrarily selected as a cutoff point. Any man with that rating or lower was automatically selected for discharge. When the results were correlated with the total number of men in each department who would have to be let go in order to get down to the required number, it was found that the arbitrary cutoff caught only 35 of the 41 required. The other six were added after conferences of Boyd and the foremen in which the value of each of the six was weighed against the value of other employees who were closer to the departmental average than 1.2.

On July 3 James Hackney III, in a speech to all the employees, announced a revised job progression plan and wage increase, effective July 17. He explained the delay on the ground that considerable time had been spent in devising the new plan. He said that, initially, the raise would amount to five cents an hour for everyone but that, potentially, the new plan would lead to additional raises ranging from eight cents to twenty-two cents an hour in two to four months. He pointed out that the new plan incorporated the employees' own suggestions, that it utilized a point factor system similar to other companies, that it was based on having each job graded by four to six men familiar with the job and that it called for publication of written job descriptions. He stressed the fairness and impartiality of the new plan. Prior raises had been granted in the late Spring and the late Fall of 1967, 1966 and 1965.

On July 11, the 41 employees previously selected were discharged. On that day Hodges Hackney's running record of projected sales versus actual sales showed a projected figure for the week ending July 19 of 159.9 bodies, actual sales of 148 bodies. James Hackney III addressed the men at that time. The discharges were effected by giving each man a form provided by the Employment Security Commission of North Carolina in which certain information common to all the discharges such as identification of the

employer and reason for separation (lack of work) was inserted. The discharged men had to return to the plant the following day in order to turn in their uniforms, receive their final paychecks, and get an individualized form which they could take to the state agency to obtain unemployment benefits. This was the first mass reduction in Respondent's work force since 1960.

## CONCLUSIONS OF LAW

The petitioner contends that the facts show violations of Section 8(a) (1) and (3) of the Act which provide:

> Section 8(a). It shall be an unfair labor practice for an employer
> (1) to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in Section 7.
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *

Petitioner contends that, unless enjoined, it may fairly be anticipated that Respondent will continue and repeat the acts and conduct which have allegedly resulted in unfair labor practices. Petitioner further contends that this Court, to determine whether injunctive relief is warranted, need only find that there is reasonable cause to believe that an unfair labor practice has been committed.

The authorization for this Court to grant the injunctive relief sought by Petitioner is found in Section 10(j) of the National Labor Relations Act:

> The Board shall have the power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice to petition any District Court of the United States * * * within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of such petition, the Court shall cause notice thereof to be served upon such person and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

This Court's function is to exercise its sound discretion in granting the relief or denying it by weighing the evidence and the circumstances of the particular case. Johnston v. J. P. Stevens and Co., 234 F.Supp. 244 (E.D.N.C.1964), affirmed 341 F.2d 891 (4th Cir., 1965). It must be recognized, in the first instance, that it is a well-established fact in the history of equity practice that the issuance of an injunction is an extraordinary remedy, and there is no indication that Congress intended to depart from that tradition by the authorization of Section 10(j). Although the statute itself provides little assistance in determining what standards are to be applied in granting or denying injunctive relief, some indication of the motivation for Section 10(j) can be found in the Senate Report No. 105 to the Labor Management Relations Act of 1947, which states in part:

> Experience under the National Labor Relations Act has demonstrated that by reason of lengthy hearings and litigation enforcing its orders, the Board has not been able in some instances to correct unfair labor practices *until after substantial injury* has been done. Under the present act the Board is empowered to seek interim relief only after it has filed in the appropriate circuit court of appeals its order and the record on which it is based. Since the Board's orders are not self-enforcing, it has sometimes been possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible to *restore or preserve the status quo pending litigation* (emphasis added) Senate Report No. 105 on S. 1126, 1 Legislative History of the Labor Management Relations Act, 1947 at 433.

■ The quoted excerpt suggests that Section 10(j) was added to the Act to enable the Board to preserve or restore the status quo while it is acting upon an unfair labor practice charge. The language would also imply, however, that Congress contemplated the use of an injunction only where there exists a continuing series of acts or a pattern of conduct which, unless enjoined, would result in "substantial injury" to the aggrieved party that could not be remedied through normal Board channels. Minnesota Mining and Manufacturing Co. v. Meter, 385 F.2d 265 (10th Cir., 1967). This view is substantiated by the language of the Supreme Court in United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953):

> The purpose of an injunction is to prevent future violations. Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed.2d 587 (1928), and of course it can be utilized even without a showing of past wrongs. * * * The necessary determination is that there exists some cognizable danger of *recurrent violation,* some*thing more than the mere possibility* which serves to keep the case alive. (emphasis added.)

The Board, generally, has properly restricted itself to seeking injunctions only in cases of extraordinary circumstances, exercising its power "not as a broad sword, but as a scalpel, ever mindful of the dangers inherent in conducting labor management relations by way of injunction." [1] McLeod v. General Electric Company, 366 F.2d 847 (2 Cir., 1966).

■ An examination of the case at hand suggests that injunctive relief would not be just and proper at the present time. Of the 41 employees who were discharged, all but two are gainfully employed. If Respondent were ordered to reinstate all 41 of the employees pending the Board's decision, there would exist the possibility that the employees would again be dismissed if the Board should determine that the original discharge was economically motivated. Since Respondent has not replaced the 41 who were discharged, there would appear to be a strong likelihood that the Board may find that the discharges were motivated by economic considerations. This Court is not convinced that an interlocutory injunction is necessary at this time to preserve or restore the status quo. This action has been pending since October 31, 1968. It would appear that if the order demanded should issue now then the status quo would be disturbed; the Respondent and Petitioner should be left where they presently stand until such time as the Board can make a full determination of all the relevant facts. The Petitioner has not shown this Court how the purpose of the National Labor Relations Act will be advanced by the granting now of the injunction which the Petitioner seeks in this case.

## ORDER

Now, therefore, in accordance with the foregoing, it is:

Ordered that the Petition of Reed Johnston, Regional Director of the National Labor Relations Board, for an interlocutory injunction pursuant to Section 10(j) of the National Labor Relations Act against Respondent be, and the same is, hereby denied.

I. Taken from an address by the Chairman of the Board, Frank W. McCulloch, before the Eighth Annual Joint Industrial Relations Conference, Michigan State University, April 19, 1962.