INLAND OIL AND TRANSPORT
CO., Plaintiff,

v.

UNITED STATES of America, United
States Army Corps of Engineers, Clif-
ford L. Alexander, Secretary of the
Army of the United States, Leon McKin-
ney, District Engineer of the St. Louis
District Corps of Engineers and James
Fogilphol and James Stewart and Ver-
non Drew, Defendants.

No. 77–969C(B).

United States District Court,
E. D. Missouri, E. D.

Dec. 13, 1978.

Goldstein & Price, Gary T. Sacks, St.
Louis, Mo., for plaintiff.

Joseph B. Moore, Asst. U. S. Atty., St. Louis, Mo., for defendants.

## MEMORANDUM OPINION

REGAN, District Judge.

Before the Court are cross motions for summary judgment. The case arises out of the implementation of a Special Notice to Navigation Interests issued March 16, 1977 by the St. Louis District of the United States Army Corps of Engineers, an agency of the United States of America. The Special Notice established a locking precedence procedure at Locks and Dam No. 26 operated by and under the control of the Corps, and which is located at Mile 202.9 on the Upper Mississippi River at Alton, Illinois.

The effect of the Special Notice was to require vessels using Locks 26 to be "ready, willing and able" prior to being placed on the waiting list for transit through Locks 26, that is, being ready to lock in the desired configuration and willing to assist (without compensation or indemnity) other vessels at such Locks as a condition of locking through its main locking chamber.[1]

Alleging that on three occasions it sustained damages because its vessels (with cargoes of petroleum and petroleum products) were denied permission to timely proceed through Locks 26 by reason of its refusal as a precondition thereto to agree to furnish aid and assistance to other vessels without compensation and without indemnification for any damages, plaintiff sought declaratory, injunctive and monetary relief. Joined as defendants are the United States of America, the Army Corps of Engineers, the Secretary of the Army, the District Engineer of the St. Louis District, the Lockmaster and (by amendments) two Shift Chiefs at Locks and Dam No. 26. We are alleged to have jurisdiction under the Suits in Admiralty Act (46 U.S.C. §§ 741–752, the Administrative Procedure Act (5 U.S.C. §§ 706 and 705), and the Constitution and laws of the United States (28 U.S.C. § 1331).

It is plaintiff's position that the mandatory locking precedence procedure set forth in the March 16, 1977 Special Notice is invalid, in that it was developed and promulgated without complying with the Administrative Procedure Act and the Federal Advisory Committee Act. Additional contentions are that the procedure, as applied to plaintiff, is violative of the National Environmental Protection Act and the 13th and 5th Amendments to the Constitution.

By way of background: Because of long-standing traffic congestion problems at Locks 26, the Corps of Engineers contracted with Peat, Marwick, Mitchell & Co. to study alternative methods for increasing this lock's capacity, pending future Congressional authorization for the construction of a replacement facility. Three alternatives were considered in the report which followed, the third of which, the Industry Choice Plan (which included a "self-help" procedure) was determined to yield the greatest incremental benefit/cost ratio.

It is undisputed that an informal, loosely organized "Government-Industry River Advisory Committee," which was composed in part of representatives of the American Waterways Operators (of which plaintiff is a member), recommended that the Corps adopt the Industry Choice Plan. The St. Louis District decided thereafter to utilize the self-help procedure and issued a Special Notice to that effect dated October 13, 1976. However it was not until the Special Notice of March 16, 1977 that the District implemented the procedure.

There is a serious question as to whether the "Government-Industry Advisory Committee" comes within the purview of the Federal Advisory Committee Act (5 U.S.C. App. 31 et seq.), and if so, whether the deficiencies of which plaintiff complains suffice to invalidate the March 16, 1977 Special Notice (which as noted infra, has since been rescinded). So, too, it is doubtful whether the speculative possibility of a pe-

1. Locks No. 26 has two lock chambers, a main chamber (600′ × 100″) and an auxiliary chamber (360′ × 110″).

troleum spillage serves to make the lockage precedence plan a major federal action which has a significant effect on the quality of the human environment and thus subject to the requirements of the Environmental Protection Act.

It is also not clear whether the Special Notice was a rule within the purview of the Administrative Procedure Act. The Secretary of the Army had theretofore promulgated regulations which are applicable to Locks and Dam No. 26 and in particular to the authority of the lockmaster. In 33 CFR 207.300 subsection (a) the lockmaster is authorized to depart from the regulations "as he deems necessary" in the event of any emergency. And in subsection (d) which sets forth the "normal" order of precedence at locks generally, the regulation expressly states that "the lockmaster may prescribe such departure from the normal order of precedence as in his judgment is warranted to achieve best lock utilization."

It is obvious that in the judgment of the St. Louis District, the situation at Locks 26 was such as to mandate some departure from the normal order of precedence in order "to achieve best lock utilization." Neither plaintiff nor any one else was compelled to make its services available for and to other vessels. However, in the interest of best lock utilization, the availability of such aid and assist services on a voluntary basis, was deemed necessary by the District.

We deem it unnecessary to definitively rule plaintiff's contentions, and in particular, to determine whether under the facts, it is entitled to declaratory and injunctive relief. Less than three weeks after this suit was filed, the requirements of the Special Notice of March 16, 1977, that vessels be willing to render aid and assistance to other vessels without compensation and indemnity as a condition of locking in normal sequence through the main channel of Locks 26, was rescinded, and the "normal" order of precedence through the main channel of Locks 26 was reinstated. In our judgment, that issue is moot or at least not presently for decision.

We recognize, of course, that the power of a court to grant injunctive relief survives discontinuance of the allegedly illegal conduct. See *U. S. v. W. T. Grant Co.*, 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303. However, as that Court stated, an injunction is appropriate only if "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive:" or, as stated in *Chacon v. Granata*, 5 Cir. 1975, 515 F.2d 922, 925, the anticipated injury must be "imminent and irreparable." No such situation is here present. In addition to the absence of any suggestion or indication that the self-help policy might again be promulgated in some fashion, we have no doubt that if consideration is again given by the Corps to doing so, the officials would first give adequate consideration to the applicability vel non of the APA, the FACA and the EPA as well as to the other contentions of plaintiff.

This leaves only the issue of plaintiff's alleged damages. Plaintiff claims it sustained damages on three occasions (August 22, 1977, September 10, 1977 and September 28, 1977)[1] by reason of delays and costs incident to its refusal to agree to provide aid and assistance to other vessels. We first consider the September 10 and 28 damage claims, both of which involve the M/V Lady Kimberly. In each of these instances, the vessel locked through the auxiliary chamber.

As to September 10, 1977, the records show that the Lady Kimberly *completed* passage one minute before the earliest time it could have *commenced* passage through the main lock. Clearly, there was no delay. Plaintiff contends, however, that it was necessary for it to hire a tugboat at a cost of $260 to pass through the auxiliary lock. Even if it be assumed that similar tug

---

1. Inasmuch as the mandatory self-help policy applicable to the main chamber of Locks 26 had been in effect since March 16, 1977, it would appear that plaintiff had, subsequent to March 16 and prior to August 22, 1977, either conformed to that policy as to the main chamber or had utilized the auxiliary chamber without incident in either case.

expense would not have been incurred for lockage through the main chambers,[2] it is at once apparent that the tug expense was approximately equal to the saving of $120 per hour cost of running the vessel had the main chamber been used.

With respect to September 28, 1977, plaintiff's damage claim is again based on the tugboat expense ($227.50) it incurred in passing through the auxiliary chamber, in addition to an alleged one-half hour delay. The evidence relied on as "proof" of the alleged delay is the fact that although it commenced passage through the auxiliary chamber about a half hour before it could have proceeded through the main chamber, plaintiff's vessel did not complete its passage through the auxiliary chamber until two and a half hours after such passage was commenced, as compared to the time of one and a half hours required for each of two other vessels to pass through the main chamber. We believe that because of numerous variables, this "evidence" is too speculative to justify a finding of a half hour delay. In addition, it is evident from the lockage reports that if the Lady Kimberly had asked to be placed on the list for the auxiliary chamber when it arrived at Locks 26 or even when it was refused a position on the list for the main lock, it would have completed its passage with no delay whatever. And in light of the fact that plaintiff was fully aware of defendant's inflexible policy respecting aid and assist requirements, there was no reason for the vessel to wait from 4:49 to 7:13 to request the use of the auxiliary lock. The records show that until the M/V Tekula arrived at 5:45, almost an hour after the arrival of plaintiff's vessel, the auxiliary lock was available for its use. And even after the Lady Kimberly was expressly refused access to the main chamber at 5:55, its passage through the auxiliary chamber could have been commenced at 7:01 a. m., the time M/V Chas. Sanders, Sr. started lockage after arriving at 6:38 a. m.

As for the tugboat expense, the mere fact it was incurred would be relevant only if assistance would not have been required had the main chamber been available. Plaintiff has made no such showing. The lockage reports for the main chamber show not only that many tows required vessel assistance, but that plaintiff's own vessel, the M/V Lady Rosemary, itself utilized such assistance on the morning of August 23, 1977, in her passage through the main chamber.

The major item of damages claimed ($640) pertains to alleged delay in permitting plaintiff's M/V Lady Rosemary to transit the main channel on August 22, 1977. Plaintiff contends that the vessel with her tow was delayed five hours and twenty minutes.[3] On the other hand, it is defendant's position that had the auxiliary chamber been availed of, the Lady Rosemary would not have been delayed at all. To meet this issue, plaintiff has submitted the affidavit of Lynn Bryan Rankin, the master of the vessel on the voyage in question, the purpose of which was to negative defendant's contention that the auxiliary lock could have been used, in which event there would have been no delay.

Of importance is the fact that Rankin did not ask to use the auxiliary chamber. And since the policy of aid and assist applied only to the main chamber and a refusal to agree to a willingness to furnish such aid, if requested, resulted only in the loss of the vessel's position in respect to the main lock, we have no doubt that both Rankin and the lockman were referring only to the main chamber in their radio conversation. Obviously, the lockman neither intended to nor had authority to deny access to the auxiliary chamber. At worst, since neither Rankin nor the lockman mentioned the auxiliary chamber, it would appear that Rankin either misunderstood or misinterpreted what the lockman said. Defendant may not

---

2. The very purpose of the self-help plan, in part at least, was to utilize the services of the other vessels and thus avoid the use of tugboats in many situations.

3. It was this action which precipitated the lawsuit.

be penalized because Rankin did not ask the simple question as to whether the use of the auxiliary chamber was also being denied him.

There being no substantial evidence to support plaintiff's damage claims, it follows from the foregoing that plaintiff's motion for summary should be and it is hereby denied and that defendants' motion for summary judgment should be and it is hereby sustained.