EDUCATIONAL SUBSCRIPTION SERVICE, INC v AMERICAN
EDUCATIONAL SERVICES, INC

Docket No. 54529. Submitted March 4, 1982, at Lansing.—Decided
April 21, 1982. Leave to appeal applied for.

Educational Subscription Service, Inc., brought an action against
American Educational Services, Inc., and Irving Lesher, III, in
the Ingham Circuit Court alleging unfair competition under the
common law and violation of the corporate name statute. The
court, Jack W. Warren, J., found (1) that the corporate name
did not violate the Michigan corporate name statute, (2) that
except for the corporate symbol "AES", the name, marketing
techniques, and other identifying features did not constitute
unfair competition under the common law, and (3) that the
corporate symbol "AES" was confusingly similar to plaintiff's
symbol "ESS". The trial court enjoined use of the symbol
"AES" but did not award damages. Plaintiff appealed and
defendants cross-appealed. *Held:*

1. The Business Corporation Act prohibits the use of a name
the same as or confusingly similar to that of any other domes-
tic corporation or foreign corporation authorized to do business
in this state. A corporate name is confusingly similar to an-
other if the first two words are identical and in the same order.
A corporate name is not confusingly similar to another if only
one of the first two words is identical unless a) one or more
words in either name has acquired a secondary meaning (a
meaning which would in and of itself serve to identify the
corporation) or b) the first word of each corporate name is
identical and particularly prominent or distinctive and, in
addition, the third word of one company's name is the same as
the second or third word of the other company's name.

2. The trial court did not clearly err in its findings.

Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 18 Am Jur 2d, Corporations §§ 146-140.
Right, in absence of self-imposed restraint, to use one's own name
for business purposes to detriment of another using the same or a
similar name. 44 ALR2d 1156.

1. Names — Corporations — Similar Names.

    The Business Corporation Act prohibits the use of a name the same as or confusingly similar to that of any other domestic corporation or foreign corporation authorized to do business in this state; a corporate name is confusingly similar to another if the first two words are identical and in the same order; a corporate name is not confusingly similar to another if only one of the first two words is identical unless a) one or more words in either name has acquired a secondary meaning (a meaning which would in and of itself serve to identify the corporation) or b) the first word of each corporate name is identical and particularly prominent or distinctive and, in addition, the third word of one company's name is the same as the second or third word of the other company's name (MCL 450.1212; MSA 12.200[212]).

2. Corporations — Unfair Competition.

    The use by a corporation of a corporate name, business practices, promotional literature and other identifying features does not constitute unfair competition with another corporation under the common law where there are conspicuous differences.

3. Corporations — Corporate Symbols.

    A court may enjoin the use by a corporation of letters as a symbol where they are confusingly similar to other letters used by another corporation as a symbol.

*Dykema, Gossett, Spencer, Goodnow & Trigg,* for plaintiff.

*Fraser, Trebilcock, Davis & Foster, P.C.,* for defendants.

Before: M. F. Cavanagh, P.J., and Allen and E. C. Penzien,* JJ.

Allen, J. This unfair competition suit filed under the common law and the Michigan corporate name statute, MCL 450.1212; MSA 21.200(212), involves two competing corporations each engaged in the solicitation of subscriptions to magazines

---

* Circuit judge, sitting on the Court of Appeals by assignment.

and each with its home office in Lansing. Hereinafter, "defendant" shall refer to the corporate defendant only. On October 7, 1980, the trial court issued a comprehensive written opinion holding (1) that defendant's corporate name did not violate the Michigan corporate name statute, (2) that except for the corporate symbol "AES", defendant's name, marketing techniques, and other identifying features did not constitute unfair competition under the common law, and (3) that the corporate symbol "AES" was confusingly similar to plaintiff's symbol "ESS". The trial court enjoined defendant's use of the symbol "AES", but did not award damages. From a judgment entered pursuant to said opinion, plaintiff appeals the trial court's holdings (1) and (2). Defendants cross-appeal the trial court's holding (3).

Plaintiff, Educational Subscription Services (ESS), started business in Lansing in 1962 and was incorporated in 1967. From 1968 until January, 1974, defendant Irving Lesher was its executive officer. In January, 1974, Lesher resigned his position with ESS and incorporated his own competing concern, American. The Michigan Department of Commerce (Corporation and Securities Bureau) determined that the names "American Educational Services" and "Education Subscription Service" were not "confusingly similar" within the meaning of MCL 450.1212; MSA 21.200(212). This determination was made by applying the following administrative standard: "Whether the two names would be deceptive or misleading in the minds of ordinary persons with ordinary intelligence."

ESS and American operate in the same educational market: each company seeks magazine subscriptions from students and educators at all grade levels through college, on a nationwide basis. They offer the same mix of magazines at similar prices.

Both companies use the "packet mailing" technique for promoting magazine subscriptions. This technique requires the companies to mail thousands of order cards to "key persons" (administrators, faculty, etc.) at all types of educational institutions. The key persons are requested to distribute the cards to students (typically by posting the cards on bulletin boards). The cards themselves contain (1) multicolored horizontally arranged pictures of the magazines available for subscription and (2) a space for the prospective subscriber to indicate his name, address, choice of subscription and method of payment. The reverse side of each card is a business reply postcard bearing the name and address and zip code of the subscription agency. American used the packet mailing technique from the very outset of its operations in 1974; the format of its cards was similar to that of ESS and other subscription agencies.

The packet mailing technique was pioneered by ESS during the 1960's. ESS's president, Shri Kumar Poddar, publicized the details of the packet mailing technique in a New York Times article in August, 1971. By 1973, the technique was used by several additional magazine subscription services, including Campus Subscriptions (Campus) and Student Subscriptions Services (Student). Between 1973 and 1978, the following additional companies used the "packet mailing" technique: University Subscription Services (University), American Collegiate Marketing (Collegiate), Washington Educational Service (Washington), University Supplies of America (Supplies), National School Subscription Center (National), and Synergistic Marketing Corporation (Synergistic), as well as defendant herein, American. Since 1977, National and Collegiate have been subsidiaries of American.

The magazine subscription agencies using the packet mail technique received mail which evidenced considerable confusion:

(1) Synergistic received mail from customers and publishers intended for ESS, American and other competitors. Such misdeliveries amounted to 500 to 750 items per year.

(2) National received many pieces of mail intended for competitors, including mail intended for ESS and American. The instances of customer confusion were similar to those reported by ESS.

(3) Collegiate also received mail intended for competitors; the nature of misdirections and confusion were similar to that reported by ESS, American and Synergistic.

(4) From early 1975 to July 1978, American received about 1,300 misdeliveries of mail intended for noncompeting businesses. American also received 276 pieces of mail addressed to competitors, 115 (42%) of which were intended for ESS.

(5) From early 1974 to mid-1977, ESS received (a) 272 pieces of mail evidencing customer confusion between ESS and American; and (b) 132 additional pieces of mail clearly addressed to and intended for American but misdirected by postal employees to ESS. Of the 272 pieces of mail evidencing customer confusion between ESS and American, 185 of these involved the inclusion of literature from one of the companies in an envelope preaddressed to the other.

ESS also received letters intended for competitors other than American. ESS did not provide the court with any data on the number of letters intended for such other competitors.

ESS made a substantial investment in its corporate symbol "ESS" in an attempt to get the public to identify that symbol with its corporate name,

Educational Subscription Services. Each of its packet mail order cards bore the following inscription:[1]

ESS

Educational Subscription Service
South Point Plaza
Lansing, Michigan 48910

During the first part of 1974, American used the following inscription on its order forms and cards:

AES

American Educational Services
409 Lentz Court
Lansing, Michigan 48917

American voluntarily discontinued the use of the symbol "AES" in mid-1974. Since then, its order cards have contained the following modified inscription:

American

American Educational Services
409 Lentz Court
Lansing, Michigan 48917

When defendant Lesher was at ESS, he signed solicitation form letters (mailed to key persons) with the phrase "executive director" appearing after his name and the word "cordially" before his signature. Form letters which he wrote on behalf of American, starting in 1974, also bore these features. American's letters also combined the

---

[1] See appendix to this opinion for a reproduction (without color) of the mail order cards with corporate symbols used by each company in the first part of 1974.

following additional features similar to those of ESS: (1) an underlined introductory sentence before the salutation; (2) a closing sentence stating that students will appreciate the recipient's thoughtfulness in distributing the order cards; (3) frequent use of block indented paragraphs; and (4) postscript messages after the signature. However, the style of American's letters was not a carbon copy of ESS's letters. There were significant dissimilarities. ESS used white paper; American used brown or tan paper most of the time. On more than two-thirds of its sample letters, ESS printed in bold face the motto "so that more may learn". American did not use any similar motto. Instead, 8 of its series of 16 letters bore the phrase "American Scholarship Program" in heavy type. Furthermore, all but one of American's series of letters bore the phrase "double the difference cash refund" if a subscriber could find a competing agency offering a subscription at a lower price. This latter phrase was unique to American's literature and was consistently emphasized by use of capital letters or exclamation marks.

ESS's gross sales reached a peak of about $1 million (annual figure) in 1974, declining to about $720,000 in 1977. During the same period, the number of orders received by ESS was cut in half. ESS's response rate (orders received divided by number of cards mailed) declined 72% between 1970 and 1977; about half of this decline took place before 1974, when American started to compete with ESS.

On December 16, 1974, ESS brought an action against American in Ingham County Circuit Court. ESS's complaint consisted of three counts: (1) Count I, alleging that American used a corporate

name and symbol confusingly similar to that of ESS, contrary to MCL 450.1212; MSA 21.200(212); (2) Count II, alleging unfair competition (that American deliberately confused customers in an attempt to pass itself off as ESS); and (3) Count III, alleging that defendant Lesher stole confidential customer lists and other "trade secrets" from ESS when he left to form his own company.

On February 20, 1975, the trial court entered a preliminary injunction restraining American from using the corporate symbol "AES" in its advertising or on its order cards pending final resolution of the case. The case went to trial without a jury. During the trial, the court dismissed Count III, (relating to the alleged theft of customer lists and trade secrets). ESS has not appealed the trial court's dismissal of Count III. October 7, 1980, the court issued its opinion, finding that (1) American's corporate name was not confusingly similar to that of ESS; and (2) American's use of forms and marketing techniques similar to those of ESS did not amount to unfair competition. However, the court did find that the corporate symbol "AES" was confusingly similar to "ESS" and refused to dissolve the 1975 preliminary injunction prohibiting defendants' use of that symbol. The court's findings were summarized at the end of its opinion as follows:

"Summarized: There has been no showing, by a preponderance of the evidence (except as to the use of the symbol 'AES') that the names of these two corporations are confusingly similar. Neither has there been a showing, by a preponderance of the evidence, that defendant, American (or Lesher) simulated the name or devices employed by the business rival, ESS; or that American (or Lesher) traded on the good name of plaintiff; or that American (or Lesher) attempted to or did, induce any

person or party to do business with American while believing that he, she, or it was doing business with plaintiff; or that American (or Lesher) is guilty of any wrongful act constituting unfair competition."

On October 22, 1980, the trial court entered a judgment permanently enjoining American from using the symbol "AES" on any of its advertising or order forms but denying all of ESS's other claims for injunctive relief and damages. ESS appeals as of right the court's order denying its claim for damages and for an injunction restraining the use of the corporate name "American Educational Services". American cross-appeals the trial court's order which prohibits its use of the symbol "AES".

Based upon this necessarily lengthy statement of facts, three issues emerge on appeal.

I. *Did the trial court err in finding that defendant's corporate name was not confusingly similar to plaintiff's name, within the meaning of Michigan's corporate name statute, MCL 450.1212; MSA 12.200(212)?*

Although the Supreme Court has not announced a particular formula for determining whether names are confusingly similar, its decisions reveal the following clear pattern:

(1) Corporate names are confusingly similar when the first two words of a compound name are identical and in the same sequence. Accordingly, the Court found confusingly similar the names in the following cases: *First National Bank & Trust Co of Kalamazoo v First National Credit Bureau, Inc,* 364 Mich 521; 111 NW2d 880 (1961); *Metal Craft Co v Metalcraft Heater Corp,* 255 Mich 642; 239 NW 364 (1931); *Grand Rapids Furniture Co v Grand Rapids Furniture Shops,* 221 Mich 548; 191 NW 939 (1923); *Belvidere Land Co v Owen Park*

*Plaza, Inc,* 362 Mich 107; 106 NW2d 380 (1960), "Owen Park Apartments v Owen Park Plaza" *Schwannecke v Genesee Coal & Ice Co,* 262 Mich 624; 247 NW 761 (1933), "Genesee Coal Co v Genesee Coal & Ice Co"; *Bell v Services Coal Co,* 280 Mich 172; 273 NW 435 (1937), "Service Coal & Ice Co v Service Coal Co". As noted above, the Corporation and Securities Bureau of the Michigan Department of Commerce has taken note of this pattern of decisions and has adopted the same criterion (whether or not the first two words of a corporate name are identical) in determining whether names are confusingly similar under the statute.

(2) Subject to two exceptions, corporate names are *not* confusingly similar when only one of the first two words of the names is the same. *Wills v Alpine Valley Ski Area, Inc,* 369 Mich 23; 118 NW2d 954 (1963) ("Alpine Ski & Sport Shop v Alpine Valley Ski Area, Inc"); *Ex-Cell-O Corp v Sage,* 347 Mich 210; 79 NW2d 497 (1956) ("Ex-Cell-O Corp v Ex-Cell-O Automotive Products Co"); *Federal Engineering Co, Inc v Grieves,* 315 Mich 326; 24 NW2d 138 (1946) ("Federal Engineering Co v Federal Tool and Die Co"); *Metal Craft Co v Grand Rapids Metalcraft Corp,* 255 Mich 638; 239 NW 363 (1931); *Young & Chaffee Furniture Co v Chaffee Brothers Furniture Co,* 204 Mich 293; 170 NW 48 (1918); *The Fair-South Flint Plaza, Inc v Shoppers Fair of Flint, Inc,* 358 Mich 640; 101 NW2d 342 (1960); *Peninsular Stove Co v Augst* 288 Mich 465; 285 NW 24 (1939) ("Peninsular Furnace Co v Peninsular Repair & Service Co").

(3) There are two exceptions to the principle set forth in the preceding paragraph. In other words, there are only two conditions under which the Court has found corporate names to be confusingly

similar in situations where only one of the first words of each name is the same. The first exception is as follows: where one or more words of the plaintiff's corporate name has acquired a "secondary meaning" (defined as a meaning which would in and of itself serve to identify plaintiff with that word regardless of the context in which it is used); *Montgomery Ward & Co, Inc v Ward Furniture & Appliance Co,* 327 Mich 582; 42 NW2d 747 (1950) ("Ward" for "Montgomery Ward"). The second exception applies when the first word of each corporate name is identical and particularly prominent or distinctive and, in addition, the third word of one company's name is the same as the second or third word of the other company's name. *Taylor Supply Co v Saginaw Hardware Co,* 365 Mich 576; 113 NW2d 872 (1962) ("Taylor Supply Co v Taylor Co"); *220 Bagley Corp v Julius Freud Land Co,* 317 Mich 470; 27 NW2d 59 (1947) ("Michigan Building v Michigan Bank Building" and the Court relied heavily on evidence showing 10-25 misdelivered letters *per day,* several times the volume of errors in the present case). See also the following cases cited by neither party, *Peoples' Outfitting Co v Peoples' Outlet Co,* 170 Mich 398; 136 NW 599 (1912); *Finney's Orchestra v Finney's Famous Orchestra,* 161 Mich 289; 126 NW 198 (1910).

Based upon the foregoing pattern of decisions, the following principle emerges: where no word in a plaintiff's corporate name has acquired a secondary meaning, the names of two corporations are not confusingly similar if the first word in each corporate name is obviously different. In the instant case, the first word in plaintiff's name, "Educational", and the first word in defendant's name "American", are clearly different. Plaintiff does

not claim any of the three words in its corporate name, "Educational Subscription Services", has acquired a secondary meaning. Therefore, unless there is some particular reason to make an exception to the rule, the trial court did not err in finding that the corporate names were not confusingly similar.

Plaintiff contends that the word "Educational" is the dominant word in each corporate name, and constitutes an exception to the principle of law recited above. We disagree. The word "Educational" is no more outstanding or distinctive than the word "American". In our opinion, the first word in defendant's name dominates; "Educational" does not. Furthermore, the record discloses that a large number of competing companies in the Lansing area used similar names. *Cf.* "Student *Subscription Service*", "Campus *Subscriptions*", "University *Subscription Service*", "Washington *Educational Service*". These names are equally similar to plaintiff's name as defendant's name, yet plaintiff has not accused them of unfair competition.

Our determination that defendant's corporate name was not a violation of the statute is reinforced by the administrative determination of the Corporation and Securities Bureau that the names were not confusingly similar. While we are not bound by the bureau's determination, *Universal Credit Co v Dearborn Universal Underwriters Credit Corp,* 309 Mich 608, 617; 16 NW2d 91 (1944), such determinations are highly persuasive and to be given weight on judicial review. *Allstate Ins Co v Allstate Investment Corp,* 210 F Supp 25 (WD La, 1962); OAG, 1943-1944, No 0-1209, p 537 (September 29, 1943). In summary, we find no reason to make an exception to the rule set forth

earlier and therefore conclude the trial court did not err in finding that the corporate names were not confusingly similar.[2]

II. *Did the trial court err in finding that, except for the brief use of the corporate symbol "AES", the corporate name, business practices, promotional literature and other identifying features, used by defendants, did not constitute unfair competition under the common law?*

Plaintiff vigorously argues that defendant engaged in unfair competition because defendant's solicitation letters and the packet mailing techniques closely resembled plaintiff's. Admittedly, there were similarities. But on the other hand, there were conspicuous differences. The trial court noted at least three of these differences: (1) difference in the color of each company's stationery; (2) the use of distinctive mottoes and phrases by each company; and (3) consistent emphasis on words unique to each company rather than on words used by both.

The fact that defendant also used the packet mailing technique pioneered by plaintiff provides little support for any claim of unfair competition. First, it is undisputed that several other competitors, including Campus Subscriptions and Student Subscription Service, had already used that marketing technique by 1973, before defendant had entered the business. Between 1974 and 1978, at least eight firms other than plaintiff had used the packet mailing technique. Despite the widespread use of this technique, plaintiff did not protest as

---

[2] We further note that in the instant case the second and third words in defendant's corporate name are the same as the first and third words of plaintiff's name (except plaintiff's third word is in the singular). At oral argument, we inquired if there was any case where on identical facts, name confusion was held to exist. Counsel for neither plaintiff nor defendant could cite such a case.

unfair any other firm's use of it; instead, plaintiff's protest was directed solely at defendant. Nothing in the record suggests that defendant's use of the packet mailing technique was any more "unfair" or "confusing" than any other company's use of the technique.

More important, plaintiff could hardly claim any proprietary interest in the packet mailing technique. Plaintiff did not attempt to show that the packet mailing technique was the type of process which could be entitled to copyright or patent protection, let alone that it actually was so protected. Nor was the technique a "trade secret". Plaintiff's president personally publicized the details of that technique in a 1971 New York Times interview.

Plaintiff places major reliance on the high volume of letters evidencing customer confusion and notes that the volume of such mail is "significantly higher than similar evidence considered in any reported decision in this state". *Cf. Grand Rapids Furniture Co v Grand Rapids Furniture Shops, supra, Metal Craft Co, supra.* However, proofs at trial showed that both plaintiff and defendant received more than 1,000,000 letters and cards during the four-year period 1974-1977. Of this total, plaintiff's proofs disclosed at best only a few hundred pieces of mail evidencing customer confusion. Defendant's proofs disclosed that the number of mailings showing customer confusion was approximately one out of every 1,000 mailings. Thus, the showing of customer confusion was minimal, particularly when considered in relation to the business which primarily relied upon mailings for its success.

Plaintiff's reliance upon misdirected mail is further weakened by the fact that, while plaintiff

kept a record of mail of American misdirected to plaintiff by postal employees, it did not present proof of the volume of mail of the several other competing firms received by plaintiff. As noted by the trial court, without such proof, the court was "left without the information necessary to a meaningful determination of whether ESS's experience with American mail is disproportionate".

III. *Did the trial court err in:*

*(1) Finding that the corporate symbol "AES" was confusingly similar to the symbol "ESS"?*

*(2) Enjoining defendant from use of such symbol even though defendant had voluntarily discontinued use of the symbol? or*

*(3) Refusing to award plaintiff any damages for defendant's use of such symbol in the spring of 1974?*

It is important to accurately set forth the trial court's findings on the question of allegedly similar corporate symbols. On this issue the trial court found:

"Plaintiff submits that for many years prior to the formation of American it had used the symbol or abbreviation "ESS" in identifying itself to the public. It used such abbreviation in its advertising and in the slogan: 'When You Think of Magazines, Think of ESS.' The use by American of the abbreviation "AES" *was likely to result in confusion,* as plaintiff contends, and plaintiff is entitled to a permanent injunction couched in the same words as the court's order of February 20, 1975. The court's reasoning is as follows: If one were to create an airline, name it 'Pacific Western Airlines', and use the letters 'PWA' in its advertising, reasonable minds would not differ on the question of whether there was confusing similarity and/or unfair competition with Trans World Airlines, Inc. who for many years used the identification 'TWA' in its advertising." (Emphasis supplied.)

In its cross-appeal American contends that the trial court's finding of similarity was "clearly erroneous" and had the unfortunate effect of precluding American's right to recover costs in a long and expensive proceeding. American argues that although two of the three letters are identical, the symbols are strikingly different in that the American symbol has large dots between the letters, which are in cursive type, while plaintiff's symbol is in ordinary type without intermediate dots. Moreover, the colors of the order cards on which the respective symbols appear are different. We are not persuaded.

Unlike the situation regarding similar words appearing in the corporate names of other competing agencies, nothing in the record suggests that other competing agencies used letters as corporate symbols. Thus, reader confusion over symbols would not be spread among the marketplace but would be limited to confusion between plaintiff and defendant.

In the appendix to this opinion we have reproduced the symbol "AES" as it was employed by American in the one and only mailing in which it was used. The symbol appears on American's mail order card. The appendix also contains a reproduction of plaintiff's mail order card with the symbol "ESS". Not shown in the appendix are the respective colors used on the cards and symbols. Defendants' cards and letters "AES" were in brown while plaintiff's cards and letters "ESS" were in blue.

As can be observed from the appendix, both symbols involve only three letters, two of which ("E" and "S") are identical and appear in the same sequence with the "E" preceding the "S". Thus, except for the small difference in style of the print,

the dots and the color, the symbols are similar. Furthermore, both symbols carried beneath them the corporate address. Defendant argues that because the printed addresses were different, the symbols were not used in a confusing manner. To the contrary, we conclude that American's reference to Lansing, a location previously associated only with plaintiff, enhanced the possibility of confusion.

Defendant also argues that in drawing an analogy between Pacific Western Airlines ("PWA") and Trans World Airlines ("TWA"), the trial court erred because the *sound* of the first letters in the symbols "P" and "T" is similar whereas the sound of the first letters "A" and "E" is dissimilar. We reject the argument for two reasons. First, both "A" and "E" are vowels and require a similar inflection. Second, communication between each company and its customers was not by the spoken word but by the printed word. Practically all initial solicitation was through mailings and all orders were placed in writing and sent through the mail. Visual similarity, rather than sound similarity, is the basis of potential confusion in the instant case. Accordingly, we find the trial court's findings were not "clearly erroneous" under GCR 1963, 517.1.

Six months before plaintiff filed its bill of complaint and asked for injunctive relief, defendant voluntarily discontinued using the symbol "AES". Defendant Lesher testified that the decision to drop the symbol was a marketing decision based on the belief that it would be better to emphasize the word "American" rather than the three-letter abbreviation of the corporate name. Cross-appellant contends that abandonment of the symbol made the issue moot at the time suit was started

and, as such, the action of the trial court in granting an injunction was improvident and unwarranted. As was stated by the United States Supreme Court:

"[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.,* does not make the case moot. A controversy may remain to be settled in such circumstances, *e.g.,* a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion." *United States v W T Grant Co,* 345 US 629, 632; 73 S Ct 894; 97 L Ed 1303 (1953). (Citations and footnote omitted.)

While defendant now unequivocally stated in its brief and at oral argument that it would not resume use of the corporate symbol, the testimony at the date of trial in the fall of 1978 and summer of 1979 was that discontinuance was a marketing consideration. At the time of the trial court's opinion issued October 7, 1980, there was nothing in the record suggesting that a "marketing" decision might not be reversed if conditions changed. Feeling that resumption of the corporate logos would harm plaintiff, the trial court reasonably concluded that without the restraint of an injunction defendants could determine that the changes in the market would justify a resumption of the corporate symbol. Accordingly, we hold against defendants on the cross-complaint.

The final question in issue III is whether the trial court erred in granting plaintiff an injunction but failing to grant damages or make any explanation of why damages were not due to compensate plaintiff for defendant's short-time use of the sym-

bol "AES". Plaintiff asks that we remand to the trial court to determine damages. Though the question is admittedly close, we decline to remand. Had the trial court concluded that the use of the symbol "AES" actually caused consumer confusion in the early months of 1974, we would be disposed to remand. However, as noted in the outset of our discussion of issue III, the court found that use of the abbreviation "was likely to result in confusion". Because the court found that confusion *had not yet* occurred but only *might* occur if an injunction were not granted, the court found no damages. Nor would the trial court find damages if we were to remand. The trial court's written opinion, construed in this light, is internally consistent and no error was committed in failing to award damages.

Affirmed. No costs, neither party having prevailed in full.