·James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellant,

v.

A. R. HERTZKE, Lawrence Hertzke, and Luverne Hertzke, doing business as A. R. Hertzke & Sons, Kuner-Empson Company, a corporation, A. Carson and Lawrence Rodriguez, Appellees.

No. 5237.

United States Court of Appeals
Tenth Circuit.

May 18, 1956.

Bessie Margolin, Washington, D. C. (Stuart Rothman, Sylvia S. Ellison, Eugene R. Jackson, Washington, D. C., Harper Barnes, Kansas City, Mo., were with her on the brief), for appellant.

Charles J. Beise, Denver, Colo. (James A. Woods and George C. Keely, Denver, Colo., were with him on the brief), for appellees Kuner-Empson Co. and A. Carson.

Before BRATTON, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

HUXMAN, Circuit Judge.

This action was instituted by the Secretary of Labor under Section 17 of the Fair Labor Standards Act, 29 U.S.C.A. § 217, to enjoin appellees from violating the child labor and record keeping provisions of that Act.

The appellees fall into three groups. (1) A. R. Hertzke, Lawrence Hertzke and Luverne Hertzke, doing business as A. R. Hertzke & Sons, at the time of the alleged violations of the Act were growing snap beans upon a ten-acre tract of land near Greeley, Colorado, under contract to supply the matured product to appellee Kuner-Empson Company. (2) Kuner-Empson Company is a corporation operating in Colorado processing or canning plants where it receives and cans vegetables grown by the Hertzkes and some 200 other growers under the same type of contract. It is admitted that substantial quantities of these processed vegetables are shipped into interstate commerce. A. Carson is the field manager for Kuner-Empson, in charge of relations with the growers here involved, and stands in the same position as his employer. (3) Rodriguez is a crew chief or labor boss who supervised and paid the migrant workers who were harvesting the crop of beans on the Hertzkes' acreage at the time of the alleged violation.

The Secretary's complaint in the District Court for the District of Colorado alleged that all the appellees were employers within the meaning of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.; that during the months of August, September, October and November, 1952 they repeatedly violated Sections 12(a), 12(c), and 15(a) (4) of the Act by employing several persons under the age of 16 during school hours in the production of goods for commerce; that Kuner-Empson also violated the Act by shipping in interstate commerce goods which it knew were produced with unlawful child labor; and that all appellees violated Sections 11(c) and 15(a) (5) of the Act by failing to keep the records required by the regulations (29 C.F.R.,

Part 516) promulgated pursuant thereto. An injunction was sought against any further violations of these sections.

At the trial the Secretary asserted that upon at least two occasions, September 5 and 12, 1952, minors under 16 were employed during school hours upon the Hertzkes' tract picking beans. Appellees admitted that there was such a violation on September 5, 1952, and that notice of such unlawful employment was brought to the attention of all appellees that day. The question whether there were underage minors working on the land on September 12, 1952 was disputed; but no rebuttal was presented to the testimony that such employment occurred. The trial judge in his findings of fact found a violation on September 5 and assumed for purposes of the opinion that there was also a violation on September 12. It was admitted that Kuner-Empson had notice of these two violations and shipped in interstate commerce vegetables harvested by this child labor within thirty days of the unlawful employment. There was much evidence presented on the interrelationship between the various appellees relating to the question of which were to be considered employers of the migrant workers who harvested the Hertzke crop.

At the conclusion of the trial, the Judge found that Rodriguez and the Hertzkes were employers within the meaning of the Act; but that Kuner-Empson and its field manager Carson were not. Rodriguez was "admonished to preserve proper records hereafter." The court refused to issue an injunction on any count against any of the appellees. This conclusion was predicated upon its finding that there was no evidence of the employment of underage minors after the two incidents in 1952 nor of the probability of such employment, and that Kuner-Empson in particular had taken extraordinary precautions to see that no child labor violations occurred.

Two assignments of error are urged for reversal, (1) that injunctions should have issued against all appellees, and (2) that Kuner-Empson and Carson were employers within the meaning of the Act. Even though Kuner-Empson was not an employer, an injunction would nonetheless lie against it if it knowingly violated Section 12(a), 29 U.S.C.A. § 212(a), which makes it a violation for one to ship or deliver for shipment in commerce goods produced in violation of the Act with notice of such violations. Admittedly it knew of the September 5 and 12 violations, but nevertheless accepted the harvested beans and shipped a portion of the canned product in interstate commerce. The Hertzkes and Rodriguez were found to be employers who violated the child labor provisions on the two occasions; and they do not contest that finding in this court. Section 12(a), the so-called "hot goods" embargo on manufacturers, and the 12(c) prohibition against employers, would seem to throw upon all of the appellees a similar responsibility to insure against the use of unlawful child labor.[1] The question then is whether the facts or law in this case required the lower court to issue the requested injunctions.

There are a great many decisions which have considered the propriety of an injunction in Fair Labor Standards Act cases. Many of them emphasized that the injunction section should not be administered grudgingly, but with the paramount Congressional purpose in mind.[2] Nevertheless, every case which has considered the matter points out that the trial judge is empowered with the exercise of reasonable discretion in the issuance of an injunction and that his decision will be reversed only upon a showing of abuse of that discretion. The only Supreme Court decision dealing directly with this question is Walling v. Youngerman-Reynolds Hardwood Co.,

---

1. See Walling v. Acosta, 1 Cir., 140 F.2d 892.

2. Lenroot v. Interstate Bakeries Corp., 8 Cir., 146 F.2d 325, contains a good statement of this principle.

325 U.S. 419, 65 S.Ct. 1242, 1243, 89 L.Ed. 1705, where the court said:

"First. The District Court found that even though the former piece rate agreements to be considered unlawful the respondent had no apparent intention of resuming their use. It also found no willful intention on the part of the respondent to violate the Act and no evidence of any intention of future violations. It therefore felt that there was no necessity for an injunction. While 'voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power,' Walling v. Helmerich & Payne, 323 U.S. 37, 43, 65 S.Ct. 11, 14 [89 L.Ed. 29], it may justify a court's refusal to enjoin future activity of this nature when it is combined with a bona fide intention to comply with the law and not to resume the wrongful acts. Cf. United States v. United States Steel Corp., 251 U.S. 417, 445, 40 S.Ct. 293, 297, 64 L.Ed. 343. We cannot say, therefore, that the District Court abused its discretion in refusing to enjoin the abandoned method of wage payments."[3]

This court on at least four occasions has emphasized the discretion of the trial judge and the elements he is to consider in determining whether an injunction should or should not be issued.[4] In the Mid-Continent Pipe Line Co. case we said [143 F.2d 311], "The trial court has a wide range of discretion in determining whether an injunction will lie; the question is addressed to the equitable considerations of a chancellor with power 'to do equity and to mould each decree to the necessity of each particular case'. Hecht Co. v. Bowles, supra." And in the Mitchell case we said [214 F.2d 517]:

"This case does not involve wages and hours of employees; the prayer is for injunctive relief, a matter within the equitable cognizance of the court. Coverage under the Act does not ipso facto require the court to grant an injunction against future violations, even in the face of past violations. The trial court is empowered to mold each decree to the necessity of each case. Walling v. Mid-Continent Pipe Line Co., 10 Cir., 143 F.2d 308; Walling v. Shenandoah-Dives Mining Co., 10 Cir., 134 F.2d 395. 'His discretion is necessarily broad and a strong showing of abuse must be made to reverse it.' United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303. The purpose of an injunction in a case of this kind is to prevent future violations in the public interest, not to punish for past transgressions. Equity will not do a useless or vain thing, and in the absence of some likelihood or probability that the violations will recur, the court is fully justified in refraining from entering an empty decree. See United States v. W. T. Grant Co., supra."[5]

These cases declare the principle that an injunction will not issue merely

---

3. Compare Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, to the same effect under the Price Control Act, and United States v. W. T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L. Ed. 1303, under the Clayton Act, 15 U.S. C.A. § 12 et seq.

4. See Walling v. Shenandoah-Dives Mining Co., 10 Cir., 134 F.2d 395; Walling v. Rutherford Food Corp., 10 Cir., 156 F. 2d 513, affirmed 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772; Walling v. Mid-Continent Pipe Line Co., 10 Cir., 143 F.2d 308; and Mitchell v. Chambers Construction Co., 10 Cir., 214 F.2d 515.

5. To the same effect see Walling v. T. Buettner & Co., 7 Cir., 133 F.2d 306, certiorari denied 319 U.S. 771, 63 S.Ct. 1437, 87 L.Ed. 1719; Walling v. Panther Creek Mines, Inc., 7 Cir., 148 F.2d 604; Tobin v. Flippo, D.C., 91 F.Supp. 302; Tobin v. Yankton Livestock Sales Co., D.C., 102 F.Supp. 797; Walling v. Lacy, D.C., 51 F.Supp. 1002; Fleming v. Phipps, D.C., 35 F.Supp. 627; Fleming v. National Bank of Commerce, D.C., 41 F.Supp. 833.

to punish past violations but only to stop existing violations or to prevent future infractions.

■ Although it is not clearly stated in these Labor Standards Act cases that the burden of proving the need for an injunction is upon the movant that is a general principle of law and applies with legal force here. In United States v. W. T. Grant Company, 345 U.S. 629, 73 S.Ct. 894, 897, 97 L.Ed. 1303, the Supreme Court said:

> "Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. Hecht Co. v. Bowles, supra; Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co., 1916, 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248. The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, ₊1928, 276 U.S. 311, 326, 48 S.Ct. 311, 314, 72 L.Ed. 587, and, of course, it can be utilized even without a showing of past wrongs. *But the moving party must satisfy the court that relief is needed.* The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." (Emphasis supplied.)

The trial court concluded that there was no reason to believe that future violations would occur. It found that Kuner-Empson had been diligent and made unusual efforts to educate the growers against the use of child labor; that the proven violations by any of the parties were few; and that there was no reason to believe that future viola-

tions would occur. We are not the triers of the facts. Whether as triers of the facts we might have reached a contrary conclusion is not determinative of the questions presented on appeal. We inquire only to ascertain whether there was an abuse of discretion. That question can be answered only from a consideration of the record.

■ We lay aside the fact that only *two* violations were established. We take judicial knowledge of the fact that the Administrator is dealing with a situation involving a large number of persons engaged in raising seasonable vegetables and produce and that the harvesting thereof covers only a comparatively short period of time. Significant also is the fact that beans are picked largely by itinerant labor and that much of the work is done by family groups, consisting of the husband, his wife, and generally their minor children. There is present a danger that underage minors may be employed and it is quite easy and convenient to become careless as to the exact age of the workers. Neither are we unmindful of the fact that because of the nature of the industry and because of the character of the laborers who go from bean patch to bean patch detection of violations is difficult. But that does not warrant the issuance of an injunction against specific defendants nor the reversal of the trial court's judgment refusing to issue an injunction, unless there is some reasonable ground to believe that violations by these defendants will again occur.

■ A detailed recital of the evidence is not necessary to sustain our conclusion that we cannot find the court's refusal to enter an injunction constituted an unwarranted or unreasonable exercise of discretion. There is evidence to sustain the court's finding that Kuner-Empson had been diligent and made unusual efforts to educate the growers against the use of child labor. Kuner-Empson apparently required statements from the growers at the time it took their produce that they had complied with the Fair Labor Standards Act. A Government

witness testified that Kuner-Empson was friendly and exceptional in its interest to avoid violations of the Child Labor Sections of the Act. Kuner-Empson stated the steps it had taken to insure against violations, consisting of the assembly and sending to the growers Labor Department bulletins explaining the Act, individual letters explaining the growers' responsibilities under the Act, and discussions of these matters at growers' meetings. There was testimony that after the institution of this action Kuner-Empson intensified its efforts to secure compliance by holding more discussion meetings, placing one of its employees in the field to check against violations, and switching planting dates so that wherever possible the harvest would be completed before schools opened in the fall. It is true that Kuner-Empson purchased Hertzke beans after it knew that unlawful labor had been employed in picking such beans on September 5. This is perhaps the strongest point that can be made against its contention that it is acting in good faith. However, considering the entire record we do not feel that we can say as a matter of law that the court erred in concluding that no future violations would be committed by it and in refusing to issue an injunction against Kuner-Empson.

■■ A different situation, however, is presented with regard to the complaint that appellees were violating the record keeping provisions of the Act. Section 11(c) provides that every *employer* subject to the Act shall keep such records of the persons employed by him as the Administrator by regulation requires. By regulation the Administrator requires every employer to preserve records containing, *inter alia*, the name, home address, date of birth (if under 19), and time of day and day of week on which the employee's workweek begins.[6] None of the appellees maintained such required records.

Much of the picking here was done by families working as a unit, and the only records which were kept in such cases were of the head of the family, who collected the pay from Rodriguez. Thus there was a clear violation of the requirement of the statutes and the regulations promulgated thereunder. There was no evidence of any steps taken by anyone to comply after these infractions were brought to the attention of the appellees. Kuner-Empson and Carson, its agent, have never agreed to preserve records on these workers, because they claim not to be their employers within the meaning of the Act. The court found that they were not employers but that the Hertzkes and Rodriguez were employers of the bean harvesting workers, and no appeal has been taken from such determination.

One purpose of an injunction under the Fair Labor Standards Act is to end existing violations,[7] and this case is not unlike several others where a trial court's refusal to issue an injunction against record keeping violations was overturned. In Tobin v. Anthony-Williams Mfg. Co., 8 Cir., 196 F.2d 547, 551, the court said:

"We recognize that there is discretion in the trial court in issuing or refusing to issue an injunction pursuant to Section 17 of the Act. But in this case no showing was made to the trial court as to what would be done to bring defendant's records into conformity with the requirements of the Act. No officer of defendant stated that the defendant would or would not comply. The only showing made of defendant's intention to comply was a statement said to have been made by its attorney. We infer such a statement was made to the trial court, but nothing to that effect appears in the record. On argument to this court defendant's attorney made the statement that the defendant intended to

---

6. See 29 U.S.C.A.Appendix, § 516.2.

7. See Walling v. Shenandoah-Dives Mining Co., supra.

comply. Evidence adduced on the trial showed that the defendant had failed to comply up to the time of the trial, even after two warnings were given."

On the showing in this record the trial court should have issued an injunction against the Hertzkes and Rodriguez enjoining them from violating the record keeping provisions of the Act and the regulations promulgated pursuant thereto.

Whether such an injunction should have issued against Kuner-Empson depends upon whether they are employers. In determining what is an employer under the Fair Labor Standards Act we are not limited to the common-law definition of such a relationship. The Fair Labor Standards Act contains its own definitions of employer and employee.[8] Whether Kuner-Empson is an employer must be determined from the relationships in this industry and from a consideration of the facts and circumstances under which pickers are employed. The relationship between Kuner-Empson and the Hertzkes is the same general relationship as between Kuner-Empson and all the contract bean growers. Kuner-Empson enters into one-season contracts with the Hertzkes and some 200 other growers to assure a supply of vegetables for its canning plants. The Hertzkes' contract which is typical of such agreements provides that the Hertzkes should raise on designated lands 10 acres of stringless beans, which were to be delivered, when harvested, to Kuner-Empson. Payment was provided for at one of two designated prices per hundred pounds, depending upon the grading of the beans. The contract anticipated that the grower might owe the company for seed, plants, equipment, material or monies advanced to him; and provision was made for the deduc-

tion of such sums from the amount due the grower.

Paragraph 3 of the contract provides that "Through its field agents the Company shall furnish all such supervision for planting, growing and harvesting as is deemed necessary or proper by the Company, and the Grower shall in all such respects cooperate with the Company and its field agents, and comply with all the directions of said agents, and his failure so to do will at the option of the Company release the Company from its obligation to accept the product for canning."

The growing and picking of beans is a seasonal operation of short duration. It requires a considerable amount of labor which must be available and ready when needed. It is of great importance to all concerned that an adequate supply of labor be available at the right time. To bring this about the processors' association and the growers' association cooperate with the Colorado State Employment Service to insure an adequate supply of labor. The State Employment Service sends recruiters into other states, particularly Texas, to solicit workers. Kuner-Empson sends no recruiters of its own, and does not pay the State Employment Service for their recruiting.

In order to enable this migratory labor to come into the area subsidies are apparently necessary and the members of the processors' association, including Kuner-Empson, contribute funds to this subsidization. After the laborers are brought into the area, however, they are free agents to work for whomever they desire. The State Employment Service maintains a contact office where there is kept a record of available laborers and it sends groups of these workers as needed to various farms pursuant to requests for harvesters. Some workers evidently

---

8. Section 3 of the Act contains these definitions:

"(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *

"(e) 'Employee' includes any individual employed by an employer. * * *

* * * * *

"(g) 'Employ' includes to suffer or permit to work."

attach themselves to a labor boss or crew chief, like Rodriguez, who assembles groups of pickers and undertakes to supply demands for laborers coming to him from the employment service. The rates at which these laborers and crew chiefs are paid are set by the State Employment Service.

According to the uncontradicted testimony Kuner-Empson does not attempt any direction to the growers as to how the harvesting is to be done or who is to be hired to do it. It directs only the time when the harvesting is to begin. Many of the growers have available their own labor; or assemble and direct their own crews. Approximately 60% of the growers dealing with Kuner-Empson use the crew chief system while 40% do not. If the grower does not desire to obtain his own crew for harvest, he notifies either the Colorado State Employment Service or Kuner-Empson. A request received by Kuner-Empson from one of its growers for labor is relayed to the employment service or to a crew chief who then provides the required labor to the grower.

Apparently the Hertzkes notified Kuner-Empson as to their need for laborers and it in turn notified Rodriguez, who furnished the labor to the Hertzkes. Rodriguez had no connection with Kuner-Empson other than the fact that he had worked for various of its growers in years past.

It is clear that the contract between Kuner-Empson and the Hertzkes gave Kuner-Empson broad supervisory powers over the planting and harvesting of the beans. But it also seems clear to us that such powers were limited to determining the time and conditions of the planting, the conditions under which the beans were to be raised, and the time when they were to be harvested. Kuner-Empson was interested only as to the time when these beans should be harvested. It was no concern to it who or how many persons did the actual picking. Neither can we see where the contract gave it any power to direct the Hertzkes to employ any particular person or any number of persons. It is our conclusion that under the contract Kuner-Empson had no control over the hiring or firing of the workers. From this and the other enumerated facts of the relationship the conclusion follows that Kuner-Empson was not an employer and did not, therefore, violate the provisions requiring an employer to keep records.

The judgment of the trial court so far as it refused to grant an injunction against the Hertzkes and Rodriguez enjoining them from violating the provisions of the Act and regulations relating to the keeping of records is reversed. That portion of the case is remanded with directions to issue the injunction. In other respects the judgment is affirmed.

