Robert B. **REICH**,[1] Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**IBP, INC., Defendant.**

**Civ. A. No. 88–2171–EEO.**

United States District Court, D. Kansas.

April 28, 1993.

Order Vacating Decision in Part June 3, 1993.

---

**1.** Robert B. Reich succeeded Lynn Martin as Secretary of Labor on January 22, 1993. He is therefore automatically substituted as plaintiff in this action. Fed.R.Civ.P. 25(d)(1).

Michael A. Stabler, U.S. Dept. of Labor, Kansas City, MO, for plaintiff.

David L. Wing, Michael F. Delaney, Jack L. Whitacre, Spencer, Fane, Britt & Browne, Kansas City, MO, Wendell F. Cowan, Jr., Lonnie O. Grigsby, Douglas F. Duchek, IBP, Inc., Dakota City, NE, John N. Badgerow, Spencer, Fane, Britt & Browne, Overland Park, KS, Ronald J. James, Squire, Sanders & Dempsy, Cleveland, OH, for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This action filed by the Secretary of Labor, United States Department of Labor ("US-DOL"), alleges that defendant, Iowa Beef Packers ("IBP"), violated sections 15(a)(2) and 15(a)(5) of the Fair Labor Standards Act of 1938, as amended 29 U.S.C. § 201 et seq. ("the FLSA"), during the period from April 1, 1986, to August 1, 1988 (the "relevant period"). Pursuant to section 17 of the FLSA, 29 U.S.C. § 217, the Secretary seeks to enjoin and restrain defendant from violating the overtime and recordkeeping provisions contained in sections 7 and 11(c) of the FLSA, 29 U.S.C. §§ 207, 211(c).

The trial of this case was bifurcated and the first phase, the compensability issue, was tried to the court for three days commencing September 14, 1992. The court, after considering all the evidence and briefs submitted by the parties, makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

### Findings of Fact

1. Plaintiff Lynn Martin was, at the time of the trial of this matter, the current duly appointed Secretary of Labor, United States Department of Labor, and was charged with the duties, responsibilities and authority vested in her by the provisions of the FLSA.

2. Defendant, IBP, Inc., was a corporation engaged in the slaughter, processing and packing of beef and pork with places of business in the following locations: Emporia and Holcomb ("Finney County"), Kansas; Madison and West Point, Nebraska; Luverne, Minnesota; Denison, Storm Lake, Council Bluffs, and Columbus Junction ("Louisa County"), Iowa; Joslin, Illinois; and Boise, Idaho.

3. The Emporia, Finney County, and Joslin plants ("the complex plants") conducted slaughter, carcass production,[2] and beef processing operations. The Boise, West Point, Luverne, and Denison plant operations were limited to slaughter and carcass production of beef. The Madison, Council Bluffs, Storm Lake and Columbus Junction plants (the "pork plants") were engaged in the killing and processing of hogs.

4. These plants varied in physical size and number of employees. IBP employed between 6,000 and 7,000 employees on a given day in these eleven plants—the complex plants were the largest with over 1,200 employees. In all, approximately 23,580 hourly production workers were employed during the relevant period.

2. "Carcass production" is the reduction of the live animal to a carcass.

5. The production floor was divided into two "sides"—the "hot side" and the "cold side." The hot side involved a series of work stations along the chain from which the carcass hung while various portions were removed. The hot side ended at the final rail where the United States Department of Agriculture ("USDA") inspected the carcass.[3] At that point, if the meat passed inspection, it became "edible product" and was placed in the "hot box" where the meat was chilled. The meat then proceeded to the cold side for processing.

6. Within each side, there were generally two types of hourly production workers: 1) those who used knives or other meat cutting utensils in the performance of their jobs; and 2) those who did not use knives or other cutting utensils.

7. Generally, all production employees wore sanitary white outer garments and at least some protective gear while on the production floor.

8. *Safety Equipment Requirements:*

Production employees were required by general Occupational Health and Safety ("OHSA") requirements to wear at least a hard hat, safety footwear,[4] and ear plugs while working on the production floor. In addition, production workers who used knives or other meat cutting utensils were also required by OHSA to wear various types of special personal protective equipment. Unlike the hard hat, earplugs, and safety footwear, this additional protective equipment was unique to the meat processing industry and was mandated by the nature of the work performed by the employees. IBP did not allow employees to perform any production duties without the required personal protective equipment.

The personal protective equipment requirements varied by position on the production floor. In general, employees wore some combination of the following: a mesh apron, a plastic belly guard, mesh sleeves or plastic arm guards, wrist wraps, mesh gloves, rubber gloves, "polar sleeves," rubber boots, a chain belt, a weight belt, a scabbard, and shin guards.

9. Generally, IBP furnished employees with personal protective equipment.[5] Until 1988, employees were required to store all IBP-owned personal protective equipment (except safety footwear) in their lockers at the plant; they were only allowed to take this equipment home with special permission. This practice was designed to insure that the personal protective equipment was available at the plant for use by the employee on each shift and to safeguard the equipment. In 1988, however, IBP made storage in the lockers optional and employees were allowed to take the equipment outside the plant.

10. Employees were required to pay the cost of any personal protective gear that was lost or stolen. Thus, the lockers benefitted the employees by enabling them to conveniently and securely store the equipment on the premises.

11. *Sanitary Requirements:*

The USDA Food Safety and Inspection Service ("FSIS") required production employees who handled exposed edible product to cover street clothing with a clean outer garment, preferably of a light color, and to wear hairnets or other effective hair restraints. Employees were prohibited by IBP from wearing their outer garment outside the plant, but hairnets were permitted to be worn outside the plant.

12. IBP furnished most employees with clean white outer garments ("whites") and, at most plants,[6] with daily laundry service at no

---

3. The hot side was referred to as the "slaughter" side in beef plants and the "kill" side in pork plants.

4. Safety footwear consisted of steel toed shoes or rubber boots as appropriate for the work conditions.

5. Safety footwear was not furnished at every plant. Pork plant employees were not furnished

safety footwear until after ninety days of employment.

6. In the pork plants, employees were not furnished whites until after they had been employed over ninety days. Employees at the Boise plant were required to launder the outer garments

charge to the employee. Employees at the Joslin, Finney County, Emporia, and Denison plants were, until sometime in late 1987 or 1988, required to pick up whites at the laundry room before their shift and return them to the laundry room after the shift. After that time and at all other plants throughout the relevant period (except Boise), the whites were placed in a bag on the employees' locker door at the start of each work day. Employees were required to place the outer garments in a receptacle located in the production area or near the locker room door at the end of the shift.

13. In addition, about ten percent of employees on the slaughter side were required to wear rubber aprons for sanitary purposes.

14. FSIS required that all sanitary and personal protective equipment used by production employees engaged in the slaughter, cutting, or boning operations be maintained in a clean and sanitary manner.

### 15. *Optional Equipment:*

Many employees not required to wear a rubber apron chose to do so for comfort because it kept them dry and made cleanup easier. Employees also wore cotton or rubber gloves, cotton aprons, and additional layers of clothing under their whites for comfort or convenience.

16. Employees were required to remove their clean outergarments and protective gear before going to the restroom or to the cafeteria for their lunch break.

### 17. *Knives:*

IBP furnished knives and other meat cutting utensils to employees at no cost.[7] These cutting utensils were primarily sharpened[8] and serviced by knife room personnel who were paid for their work in the knife room.

18. The procedures by which employees obtained sharpened knives for use on the production floor varied by plant location. The knife room opened at least an hour before the first shift began and closed an hour after the last shift ended. Generally, employees visited the knife room either before or after their production shift. However, some employees also went to the knife room during their paid breaks, unpaid lunch breaks, or paid work time.

At most plants, employees exchanged their knives for sharpened knives at the knife room only when necessary. At these plants, workers stored the knives in their lockers overnight. At the Finney County plant, employees were required to check their knives into the knife room each night and pick them up each morning. Similarly, at the West Point plant, at least some employees were required to deposit their knives in a rack at the knife room each night and pick them up each morning.

At some plants, employees waited at the knife room while their knives were sharpened and returned to them. At others, employees exchanged dull knives for sharpened knives. Either way, workers frequently had to wait in line at the knife room.

19. IBP required production employees to report for work at the start of each shift with clean knives and protective equipment and to maintain them in a sanitary manner throughout the shift. To comply with these requirements, most employees cleaned their knives and personal protective equipment at wash facilities using hot water from high pressure hoses located within the production area. This occurred as often as necessary during the shift and at the end of the shift. Employees were paid for all cleaning that occurred during the production shift, but were not paid for cleaning that occurred at the end of the production shift. Some employees had to wait for their turn at the wash station at the end of their shift.

20. Workers arrived at the plant at various times. The defendant required employees to be at their work station ready to commence work when their production shift started—i.e. when the first piece of product

themselves for which they were paid an additional one half hour per week.

**7.** IBP also furnished employees belt chains and scabbards to carry and shield knives. Employees were required to wear these chains and scabbards and to store their knives in the scabbards at all times when the knives were not in use on the production line.

**8.** Employees restored the edge to their knives while at the work station using a device called a "steel," but more serious damage to the edge of the knife required sharpening in the knife room.

arrived. Although defendant had no express requirement that employees report for work prior to this time, as a practical matter, employees had to arrive earlier in order to be at their work station, dressed in whites and protective gear, knife in hand, and ready to work by the start of the shift.

21. Employees would not have been able to put their protective gear on at home (even if they had been allowed to do so) and then drive to work. The protective gear involved was bulky and cumbersome. Although employees could have been allowed to take the gear home, they would still have had to put it on after they arrived at the plant.

22. Upon arriving at the plant, employees engaged in a variety of activities and the sequence of these activities varied by employee. In general, IBP did not control or prescribe any required sequence for these pre-shift activities.[9]

Upon arrival, employees would generally first go to their lockers where they would typically leave personal items such as their coat. Some employees would either pick up or put on part or all of their personal protective equipment and their whites. Others would go to the restroom or the cafeteria and then return to their locker to dress or pick up their gear. Still others would pick up their gear, proceed to the cafeteria and then on to their work station. Although not required by IBP, some employees changed out of their street clothes and into their whites. Some employees picked up their knives at their locker while others picked up their knives at the knife room. In general, employees clocked in as they went to their work stations or as they passed the cafeteria. Employees then proceeded to their work station to begin the production shift. Many knife carrying employees would ready their knives for the first cut at this time using their steel.

23. At the end of their shifts, employees generally cleaned their knives and personal protective gear, walked to the knife room (if necessary), clocked out, proceeded to their lockers, undressed, placed their protective gear in their locker and their whites in a laundry receptacle (all plants except Boise), and left the plant. Although not required by IBP or otherwise,[10] many employees also showered.

24. Employees were not required to clean their work stations. IBP employed workers specifically to clean the stationery tools and instruments, such as the Wizard knife, at the end of the workday.

25. All IBP plants utilized a production line process with meat proceeding along the chain or belt conveyors from work station to work station. The actual production shift was staggered—workers commenced production when the first product reached their work station and ceased production when the last product left their station.

26. Commensurate with this production schedule, workers were paid according to "gang time," a method of calculating wages based on the line or work unit as determined and recorded by the production supervisor. This method compensated employees for time actually spent in production at the work station—workers were paid from the time that the first meat product arrived at the first work station on the line to the time that the last meat product left the first work station. Workers were paid for a fifteen minute break, but were not paid for a half hour lunch. Overtime was paid for all documented time over forty hours per week.

27. The defendant neither recorded nor paid workers for any time before or after actual production at their work station. Outside the production shift, employees were not paid for time spent: 1) putting on or taking off personal protective equipment or clean outer garments; 2) cleaning knives or personal protective equipment or waiting in line to do so; 3) exchanging knives at the knife room or waiting in line to do so; or 4) walking to and from the laundry room, locker room, knife room, time clock, wash areas, or the production areas.

9. However, prior to installation of identification card readers, IBP used a time clock solely for the purpose of recording attendance. During this time, IBP required employees to clock in no more than 7 minutes before the start of their production shift and to clock out no more than 7 minutes after the end of their production shift.

10. The employees did not handle any toxic chemicals or other dangerous substances making showering before leaving the premises necessary for safety reasons.

28. During the relevant period, the standard practice in the meat industry (absent a collective bargaining agreement to the contrary) was that employees were not compensated for preliminary or postliminary activities such as walking, changing clothes, donning protective gear, having knives sharpened, and cleaning equipment or knives.

29. During a compliance review of the Storm Lake plant in 1988, Thomas Lammers, USDOL compliance officer, noted in his report (Defendant's Trial Exhibit 433) that "[t]here is some feeling that the walk time should be counted as hours worked because the employees have to change clothes by law . . . ." However, Lammers was told by his supervisor not to count walk time from the locker room to the work station and back as compensable time.

30. An unnamed compliance officer with the USDOL told Mr. Arden Walker, then VP for labor relations at IBP, that the knife room arrangement at the Denison plant was in compliance with USDOL requirements under the FLSA. In reliance upon this opinion, IBP set up knife rooms in the rest of their plants.

31. The defendant was a self-insured employer for workers' compensation purposes in the following states: Idaho; Illinois; Iowa; Kansas; Minnesota; and Nebraska. Defendant was therefore required to pay reasonable medical expenses and compensation benefits resulting from a work-related injury or illness.

32. In preparation for this case, the Secretary of Labor identified 23,580 hourly production workers who were employed at the plants in question during the relevant period and mailed a questionnaire to each of them. 5,743 questionnaires were filled out and returned. Of those responding, plaintiff selected at random 575 to be scheduled for depositions. 485 depositions were ultimately taken, some of which were submitted as evidence at trial.

## Conclusions of Law

This action for injunctive relief was brought pursuant to Section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217. We have federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

Defendant was, at all relevant times, an employer within the meaning of the FLSA. The business activities of the defendant constituted an enterprise, as defined in 29 U.S.C. § 203(r), engaged in commerce or in the production of goods for commerce, as defined in 29 U.S.C. § 203(s)(1). Therefore, the provisions of 29 U.S.C. §§ 207(a)(1) and 211(c) were, at all relevant times, applicable to the employees referred to herein.

Under the FLSA, the defendant was required to pay minimum wage for all hours worked and overtime pay for all hours worked over forty per week. The terms "work," "hours worked," and "compensable time" are not defined in the FLSA. However, work for which the employees must be compensated under the FLSA means "mental or physical exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer." *Tennessee Coal, Iron & R.R. v. Muscoda*, 321 U.S. 590, 598, 64 S.Ct. 698, 703, 88 L.Ed. 949, *reh'g denied*, 322 U.S. 771, 64 S.Ct. 1257, 88 L.Ed. 1596 (1944).

■ An employer suffers or permits the employee to work if work is undertaken by the employee with the employer's knowledge and consent. 29 U.S.C. § 203(g); *Walling v. Jacksonville Terminal Co.*, 148 F.2d 768 (5th Cir.1945); *Donovan v. Hudson Stations, Inc.*, 1983 WL 2110, 99 Lab.Cas. (CCH) ¶ 34,-463 (D.Kan.1983).

■ Even though an employer has not specifically ordered an employee to work, an employee must be compensated for time spent working on the employer's behalf if the employer accepts the benefits of such work and does not act to stop performance of the work it does not want performed. *Handler v. Thrasher*, 191 F.2d 120 (10th Cir.1951); *Hudson Stations*, 1983 WL 2110, 99 Lab.Cas. (CCH) ¶ 34,463 29 U.S.C. § 203(g); 29 C.F.R. §§ 785.11, 785.13.

In 1946, the Supreme Court in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), interpreted the FLSA to require compensation for certain activities performed after the employees arrived at their place of work but before they began actual production. *Mt. Clemens*, 328 U.S. 680, 692–93, 66 S.Ct. 1187, 1194–95, 90 L.Ed. 1515, *reh'g denied*, 329 U.S. 822, 67 S.Ct. 25, 91 L.Ed. 699 (1946). These activi-

ties were termed "preliminary." Specifically, employees were to be compensated for "putting on aprons and overalls, removing shirts, taping or greasing arms, putting on finger cots, preparing the equipment for productive work, turning on switches for lights and machinery, opening windows, and assembling and sharpening tools." *Id.* Walk time was also characterized as compensable, though deemed to be *de minimus. Id.* at 691–92, 66 S.Ct. at 1194–95.

In response to the *Mt. Clemens* decision, Congress enacted the Portal–To–Portal Act of 1947, 29 U.S.C. § 254, (the "Portal Act") which provides in pertinent part:

> [N]o employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938 ... on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee ...
>
>> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>>
>> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time of any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

The legislative history of the Portal Act indicates that preliminary activities such as those held to be compensable in *Mt. Clemens* are no longer compensable under FLSA. *See Steiner v. Mitchell,* 350 U.S. 247, 253–56, 76 S.Ct. 330, 334–36, 100 L.Ed. 267 (1956); *Dunlop v. City Electric, Inc.,* 527 F.2d 394, 398–99 n. 7 (5th Cir.1976).

■ However, activities performed by employees either before or after their regular work shifts, on or off the production line, are compensable under the FLSA, even if expressly excluded by the language of the Portal Act, when those activities are an integral and indispensable part of the principal activities which the workers are employed to perform. *Steiner,* 350 U.S. at 255–56, 76 S.Ct. at 335–36; *Mitchell v. King Packing Co.,* 350 U.S. 260, 262–63, 76 S.Ct. 337, 339, 100 L.Ed. 282, *reh'g denied,* 350 U.S. 983, 76 S.Ct. 466, 100 L.Ed. 851 (1956); *D A & S Oil Well Servicing, Inc. v. Mitchell,* 262 F.2d 552, 555 (10th Cir.1958).

The Court in *Steiner,* decided after the passage of the Portal Act, held that clothes changing and showering were compensable where employees at a battery production plant were exposed to dangerous toxic chemicals and lead. *Steiner,* 350 U.S. at 253–56, 76 S.Ct. at 334–336. The Court reasoned that the workers' jobs required exposure to toxic substances which remained on the workers' clothes and bodies. Therefore, clothes changing and showering were an integral and indispensable part of the principal activity because they were essential to the safe performance of the workers' jobs. *Id.* at 250, 76 S.Ct. at 332. The Court expressly stated that clothes changing and showering are not compensable under "normal" circumstances. *Id.* at 249, 76 S.Ct. at 331.

In a companion case, the Court used the *Steiner* "integral and indispensable" test and declared that time spent sharpening knives by employees at a meat packing plant was compensable. *Mitchell v. King Packing Co.,* 350 U.S. at 262–63, 76 S.Ct. at 339. The Court reasoned that razor sharp knives were essential for the knifemen to perform their jobs and thus they were an integral and indispensable part of the workers' principal activities. *Id.*

The Tenth Circuit, applying the integral and indispensable test in *D A & S Oil Well Servicing,* stated:

> [D]riving a truck is a totally different type of activity from that performed by such driver-employee at the well site. But employees who transport equipment without which well servicing could not be done, are performing an activity which is so closely related to the work which they and other employees perform, that it must be considered an integral and indispensable part of their principal activities.

262 F.2d at 554–55.

**1324**

*Clothes changing time:*

█ The time spent by employees donning their clean white outer garments is not compensable. First of all, the Portal Act specifically excludes clothes changing time. 29 U.S.C. § 254(a). Secondly, *Steiner* is distinguishable from the instant case. The holding of *Steiner* was very narrow and closely tied to the extreme facts presented by that case. The Court stressed the toxicity of the materials involved in manufacturing batteries and discussed at length the dangers inherent in working with such materials. *Steiner,* 350 U.S. at 249–50, 76 S.Ct. at 331–32. The Court concluded,

> We find no difficulty in **fitting the facts of this case** to that conclusion [that changing and showering were compensable] because it would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these employees.

*Id.* at 256, 76 S.Ct. at 335 (emphasis added).

There are no similarly extreme safety concerns in the present case which required the workers to change their clothes or shower. The Secretary contends that clothes changing time should be compensable because, to comply with the USDA regulations, the IBP required the workers to wear clean, sanitary outer garments. The Secretary also contends that clothes changing was necessitated by the nature of the work because the employees' clothing became soiled throughout the workday.

█ We decline to extend *Steiner* to cover the present situation. First of all, we do not believe that the USDA requirements transform an otherwise preliminary activity (clearly exempt under the Portal Act, 29 U.S.C. § 254(a)) into a principal activity. *See McComb v. C.A. Swanson & Sons,* 77 F.Supp. 716, 719–23, 717 (D.Neb.1948) (poultry processing). Secondly, the mere fact that the workers' clothing became soiled does

not necessarily make clothes changing compensable. *See Mitchell v. Southeastern Carbon Paper Co.,* 228 F.2d 934, 935–39 (5th Cir.1955) (carbon paper manufacturing).[11] Rather, this fact shows that wearing the outer garment benefitted the employee as well as IBP. Finally, an activity is not compensable simply because it is required by the employer. *See Merrill v. Exxon Corp.,* 387 F.Supp. 458, 460, 464–66 (S.D.Tex.1974).

In the present case, there were no extreme safety concerns (with regard to outer garments) similar to those that led the Supreme Court to declare the showering and clothes changing time in *Steiner* compensable. We, therefore, conclude that clothes changing time was not compensable in this case.

*Knife room wait time:*

█ By analogy to *Mitchell v. King Packing,* the time spent in the present case waiting at the knife room for sharpened knives was compensable. The time spent was "hours worked" because it involved "mental or physical exertion (whether burdensome or not)." *Tennessee Coal,* 321 U.S. at 598, 64 S.Ct. at 703. IBP required the employees to pick up the knives and transport them to their work station and the employees used sharpened knives "necessarily and primarily for the benefit of the employer." *Id.*

The use of knives was clearly an integral and indispensable part of the employees' work on the production line at IBP. *See Mitchell v. King Packing,* 350 U.S. at 262–63, 76 S.Ct. at 339. The employees could not perform their work without sharpened knives. We see no distinction between actually sharpening knives and waiting to obtain sharpened knives—the benefit to IBP was the same. IBP required employees to use sharpened knives to perform their work and to report for work at their work station with sharpened knives. Further, IBP required employees to use the knife room for sharpening.[12] Thus, time spent picking up sharpened knives at the knife room was compensable.

---

**11.** Although both *McComb* and *Southeastern Carbon* were decided before *Steiner,* they were not reversed by *Steiner.* Unlike *Steiner,* clothes changing was not necessitated by safety considerations in either case.

**12.** There is some dispute over whether the employees were required to use the knife room. Even if IBP did not *require* employees to use the knife room to obtain sharpened knives, IBP

An employee who is "engaged to wait" for the benefit of the employer should be compensated. *Skidmore v. Swift & Co.*, 323 U.S. 134, 137, 65 S.Ct. 161, 163, 89 L.Ed. 124 (1944); *see also Armour & Co. v. Wantock*, 323 U.S. 126, 133, 65 S.Ct. 165, 168, 89 L.Ed. 118 (1944); *Renfro v. City of Emporia*, 948 F.2d 1529, 1536–38 (10th Cir.1991). Wait time is time worked under FLSA if the employee is "unable to use the time effectively for his own purposes." 29 C.F.R. § 785.15. In the present case, employees were unable to use effectively for their own purposes the time spent waiting in line at the knife room to pick up knives or at the wash stations to wash their knives and personal protective gear[13] after their shift. Therefore, wait time at the knife room and the wash stations was compensable.

*Knife room walk time:*

Walk time is compensable (notwithstanding language in the Portal Act expressly exempting walk time) when it occurs after the start of the workday. *See* 29 U.S.C. § 254(a); 29 C.F.R. §§ 790.6, 790.7. The Portal Act exempts only walk time which occurs outside the workday. 29 U.S.C. § 254(a) (Only walk time which occurs "either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities" is exempt.) " 'Workday' means the period between the commencement and completion on the same workday of an employee's principal activity or activities." *Id.* at § 790.6(b). Thus, the workday began with the commencement of the first principal activity. *Id.*

As we have already determined, knives were an integral and indispensable part of the production work of knife carrying employees. Thus, the first principal activity for these employees was to pick up sharpened knives with which to perform their job on the production line. Therefore, the knife carry-

ing employees' workday began and ended at the knife room because that was where the first and last principal activity occurred.[14]

We thus conclude that the time spent walking from the knife room to the work station and back to the knife room was compensable because it occurred during the workday. For clarity, we stress that the walk time was not compensable because the employees were carrying hand tools. *See* 29 C.F.R. § 790.7(d) (carrying ordinary hand tools does not transform preliminary activity into a principle activity). Rather, the walk time is compensable because the workday was already underway. *See* 29 U.S.C. § 254(a), 29 C.F.R. §§ 790.6, 790.7; *see also D A & S Oil Well Serv., Inc. v. Mitchell*, 262 F.2d 552, 555 (10th Cir.1958) (time spent performing services essential to the performance of the principal activity was compensable); *Dole v. Enduro Plumbing, Inc.*, 117 Lab.Cas. (CCH) ¶ 35,418, 1990 WL 252270 (C.D.Cal.1990) (all work subsequent to the triggering of the workday was compensable).

*Laundry room walk time:*

However, the time spent by employees walking to and from the laundry room at the Joslin, Finney County, Emporia, and Denison plants to pick up and deliver whites (prior to the time when IBP began delivering whites in bags to the employees' lockers) was not compensable. As we have already discussed, the wearing of sanitary outer garments was not an integral and indispensable part of the production employees' jobs. Thus, time related to obtaining sanitary outer garments was not compensable.

Although IBP derived some benefit from not having to deliver the whites, the time spent by employees picking up the whites or returning them to the laundry room at the end of the day was not *primarily* for IBP's benefit. *See City Electric*, 527 F.2d at 401. In addition, the mere fact that an activity benefits the employer does not automatically compel the conclusion that the activity is compensable. As the court in

clearly required employees to report for work with sharpened knives. Thus, the only alternative would have been for employees to sharpen the knives themselves and that activity would clearly have been compensable under *Mitchell v. King Packing*, 350 U.S. at 262–63, 76 S.Ct. at 339.

13. We will discuss the compensability of time spent related to personal protective gear below.

14. Although some employees stored their knives at their lockers instead of at the knife room, all employees were required to obtain sharpened knives from the knife room. Thus, regardless of when they visited the knife room or where their knives were stored, the knife room was the one constant for all knife-carrying employees.

*Apperson, Jr. v. Exxon Corp.,* 1979 WL 1979, stated,

> the fact that an activity is beneficial to an employer does not necessarily make it compensable. Indeed, the very purpose of the Portal Act was to make non-compensable certain activities [which], even though they were necessary, were performed on the premises and could be said to benefit the employer.

87 L.C. (CCH) ¶ 33,844, at 48,937 (E.D.Cal. 1979).

IBP furnished and laundered the garments at no cost to the employees. Thus, the employees benefitted from not having to provide their own sanitary garments and from not having to transport the outer garments home to launder them. We, therefore, conclude that any time involved in retrieving the outer garments from the laundry room or returning them to be laundered was a part of taking advantage of this benefit and was not compensable.

*Personal protective gear:*

 The donning of personal protective gear unique to the production job performed by the employee was compensable. The present case is analogous to *Steiner*—the lethal chemicals in *Steiner* were similar to the lethal razor sharp saws and knife blades in the instant case. Many IBP production employees were required by the dangers inherent in the jobs they performed to wear gear to protect them from serious injury. Thus, the wearing of this personal protective equipment was so closely related to the performance of the principal activity they were hired to perform on the production line that it became an integral and indispensable part of that principal activity. *See Steiner,* 350 U.S. at 253–56, 76 S.Ct. at 334–35.

IBP argues that it was not required to furnish the protective gear to the employees. *See* 29 C.F.R. § 1910.132 (discusses "employee-owned" equipment); *Budd Co. v. Occupational Safety & Health Review Comm'n,* 513

F.2d 201, 202–04 (3d Cir.1975) ("Congress did not explicitly require that the employer pay the price of personal protective equipment and clothing."). Thus, IBP contends that it should not be "handed a whopping OSHA bill" simply because it took steps (at its own expense) to insure worker safety.

We commend IBP's actions in furnishing its workers with protective gear when it was not required to do so. However, we note that IBP received several substantial benefits because employees wore the protective gear. First, the protective gear enabled IBP to comply with OSHA.[15] Second, IBP benefitted from reduced workers' compensation claims because IBP was self-insured.

Moreover, we disagree with IBP's contention that if the employees had been required to don the protective gear at home instead of at the plant, there would be no question that employees would not have been compensated. As a practical matter, it was not possible for employees to put the gear on at home (even if they had been allowed to do so) and then drive to work in their gear. The protective gear was bulky and cumbersome. Although employees could have been allowed to bring the protective gear from home, they would still have had to put it on after they arrived at the plant. Thus, IBP was required to compensate employees for putting on the gear at the work station.[16]

 IBP's requirement that the workers store their protective gear in their lockers did not make the act of picking up the gear at the locker the first principal activity of the workday. The lockers were primarily for the benefit of the employees; they provided convenient storage for the employees' personal belongings during the workday as well as secure storage for the protective gear overnight. Secure storage was an important benefit to the employees because they were responsible to pay for the protective equipment in the event of loss or theft.

---

15. OSHA imposes requirements on both the employer and the employees to comply with the safety regulations. 29 U.S.C. § 654. However, the ultimate responsibility for compliance rests with the employer and only the employer is subject to penalties for violations. *Atlantic & Gulf Stevedores, Inc. v. Occupational Safety & Health*

*Review Comm'n,* 534 F.2d 541, 545, 553–54 (3d Cir.1976); 29 U.S.C. §§ 658(a), 659(a).

16. However, the wearing of standard protective gear which was not uniquely required by the dangers of the various production jobs being performed was not compensable. Such standard

*Clean up time:*

The time spent cleaning knives and unique personal protective gear was compensable. We have already determined that unique personal protective gear was an integral and indispensable part of the production workers' principal activity. Employees were required to report for work with clean protective gear. Clean up of the unique protective gear was, therefore, an integral and indispensable part of the employees' principal activity.

The knife clean up was also compensable. Knives were an integral and indispensable part of the employees' principal activity and they could not be used unless they were clean. Thus, knife clean-up time was compensable, unless it was de minimus.[17] *See Wirtz v. Harrell Packing Co.,* 16 WH Cases 420, 422 (W.D.Tex.1964). In addition, clean up was compensable for knife carrying employees because it occurred during the workday, i.e., between the first and last principal activity of visiting the knife room. *See* 29 C.F.R. §§ 790.6, 790.7.

*Back pay:*

Sections 9 and 10 of the Portal Act, 29 U.S.C. §§ 258, 259, expressly limit reliance on administrative rulings to *written* regulations, orders, rulings, approvals, or interpretations issued by the Wage and Hour Division of the Department of Labor. The Department of Labor bulletin interpreting this part of the Portal Act provides:

> Under the provisions of sections 9 and 10 of the Portal Act, an employer has a defense against liability or punishment in any action or proceeding brought against [the employer] for failure to comply with the minimum wage and overtime provisions of the Fair Labor Standards Act, where the employer pleads and proves that 'the act or omission complained of was in good faith in conformity with and in reliance on any administrative regulation, order, ruling, approval, or interpretation' or 'any administrative practice or policy * * * with respect to the class of employers to

which [the employer] belonged.' ... [t]he regulation, order, ruling, approval, interpretation, administrative practice or enforcement policy relied upon and conformed with must be that of the 'Administrator of the Wage and Hour Division of the Department of Labor,' and ... may be relied on only if it is in writing.

29 C.F.R. § 790.13 (emphasis added).

■ The recovery of back pay is not barred under 29 U.S.C. § 259 by the representations of Department of Labor Wage and Hour compliance officers because these representations were not written opinions issued by the Administrator. *See Renfro v. City of Emporia,* 732 F.Supp. 1116, 1119 (D.Kan. 1990), *aff'd on other grounds,* 948 F.2d 1529, 1533, 1539–41 (10th Cir.1991).

■ IBP claims to have also relied on written interpretive bulletins issued by the Department of Labor—specifically, 29 C.F.R. §§ 790.7(g), 790.7(e), 790.7(d), and 790.8(a). However, the Secretary contends that IBP could not, in good faith, have relied on these bulletins because, when read in their entirety, the bulletins establish that activities necessary to perform the job are compensable. The court in *Cole v. Farm Fresh Poultry, Inc.,* 824 F.2d 923, 927–30 (11th Cir.1987), discussed reliance on interpretive bulletins in a similar situation and concluded that the employer did not meet all of the requirements of the section 259 defense when it relied on general DOL interpretive bulletins not directed to the employer's particular situation. Similarly, IBP may not invoke section 259 by asserting reliance on these general interpretive bulletins.

■ The granting of a restitutionary injunction is not automatic upon a finding of compensable time. *See Donovan v. Grantham,* 690 F.2d 453, 456 (5th Cir.1982); *Donovan v. Brown Equip. & Serv. Tools, Inc.,* 666 F.2d 148, 157 (5th Cir.1982); *Dunlop v. Saghatelian,* 520 F.2d 788, 789–90 (9th Cir.1975) (denying back pay); *Shultz v. Mistletoe Ex-*

---

safety equipment included hard hats, ear plugs, safety footwear, and safety eyewear. Although these items are required by OSHA, the time spent donning them was not compensable. Such items are uniformly required throughout many industries. These protective items were not so uniquely and closely related to the dangers inherent in

meat production to make the wearing them an integral and indispensable part of the meat production workers' jobs.

**17.** The de minimus question was not addressed in this phase of the litigation.

*press Serv., Inc.*, 434 F.2d 1267, 1272–73 (10th Cir.1970). Good faith is not a defense to an action for such an injunction. *See Dunlop v. Gray–Goto, Inc.*, 528 F.2d 792, 796 (10th Cir.1976); *Mistletoe*, 434 F.2d at 1272–73. Nevertheless, equitable considerations may play a role in our decision about the form of relief to grant. *Gray–Goto*, 528 F.2d at 796.

■■■ The present case is indistinguishable from *Gray–Goto* and *Mistletoe* in that, in all three cases, employees were entitled to wages they did not receive. We recognize that there are certain inequities in retroactive application of a new interpretation of the law in this area. *See Shultz v. Parke*, 413 F.2d 1364, 1370 (5th Cir.1969). Most obviously is the fact that IBP may not now restructure the employees' workday in order to avoid paying overtime at one and a half times the normal hourly rate. However, we feel constrained by the holdings of *Gray–Goto* and *Mistletoe* that the ultimate balance of equities weighs in favor of the uncompensated employees. What little discretion we have on this issue must be exercised with "an eye to the purposes of the Act." *Grantham*, 690 F.2d at 456. The goals of the Act were twofold: first, to compensate employees for their losses; and second, to correct continuing offenses by increasing the effectiveness of the Act's enforcement. *Id.* We thus conclude that the equities in the present case weigh in favor of the employees. Accordingly, a restitutionary injunction is appropriate.

IBP presents a compelling argument that this decision should not be applied retroactively. IBP relies primarily on the district court decision in *Durkin v. Steiner* which recognized equitable principles in refusing to apply retroactively the decision that knife sharpening was compensable. The *Durkin* court reasoned,

> Owing to the honest and justifiable difference of opinion regarding the interpretation of the law, the judgment in this case should have no retroactive effect; the liability of the defendants can hardly be said to have existed before the applicable statutes were given an authoritative interpretation, and employees who have acquiesced in the action of employers should be estopped from asserting any claims based on

conduct which by silence and inaction they condoned.

> Furthermore, the determination of the issue in this case should as much as possible have uniform effect upon all manufacturers engaged in the same business as that of defendants.... The plaintiff who seeks equity should act equitably in the performance of his public trust that the law may be made to bear alike on all factories within the field of compeition [sic].

111 F.Supp. 546, 548 (M.D.Tenn.1953), *aff'd sub nom., Steiner v. Mitchell*, 350 U.S. 247, 249, 256, 76 S.Ct. 330, 331, 335, 100 L.Ed. 267.[18] We find this reasoning compelling in the instant case. We believe that there was room for an honest and justifiable difference of opinion regarding the interpretation of the FLSA, the Portal Act and their interplay with the mandates of OSHA.

However, the Portal Act specifically includes a bar to an action for back pay in section 259 for which IBP does not qualify. We are unable, in light of this specific statutory framework, to rely solely on federal common law principles to deny back pay in this case. "Resort to federal common law is only necessary where Congress has not plainly spoken to the matter under consideration." *Federal Deposit Ins. Corp. v. Bank of Boulder*, 911 F.2d 1466, 1474 (10th Cir. 1990) (citing *Milwaukee v. Illinois*, 451 U.S. 304, 313–14, 101 S.Ct. 1784, 1790–91, 68 L.Ed.2d 114 (1981)); *see also Joiner v. City of Macon*, 627 F.Supp. 1532, 1535–36 (M.D.Ga.1986) ("Federal common law is inapplicable where Congress has determined by statute—as here the FLSA and the Portal to Portal Act ...—the underlying policy and its enforcement."). Thus, IBP will be enjoined from withholding back pay due employees for hours worked during the relevant period.

*Reasonable v. Actual Time*

■■■ Employees are entitled compensation for the reasonable time (rather than the actual time) required to put on personal protective gear and obtain sharpened knives. As the court in *Amos v. United States* held, employees should only be compensated for the "amount of time reasonably required." 13 Cl.Ct. 442, 450, 107 Lab.Cas. ¶ 34,980, at 45,261 (Cl.Ct.1987). The *Amos* court reasoned,

**18.** The Supreme Court affirmed without addressing the question of backpay. *See Steiner*, 350 U.S. at 249, 76 S.Ct. at 331.

To rule otherwise would run the risk of rewarding plaintiffs for lack of diligence in getting and returning the equipment and in walking to and from this work station and conversely, penalizing those of the plaintiffs who may have taken less than a reasonable amount of time in doing these activities.

*Id.*

### Permanent Injunction

■ A permanent injunction is not "mandatory under the law." *Mistletoe*, 434 F.2d at 1271. Rather, we may exercise our discretion to issue an order permanently enjoining IBP from future violations of the FLSA consistent with this opinion if there is a danger of future violations. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Buckley v. Wirtz*, 326 F.2d 838, 839–40 (10th Cir.1964). An injunction should not be issued as punishment for past violations, but rather, as insurance against future ones. *See Mitchell v. Hertzke*, 234 F.2d 183, 198–87 (10th Cir. 1956). The Secretary bears the burden of proving that an injunction is warranted. *Id.* at 187.

IBP has not entered into an agreement to comply in the future. *See Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959) (injunction unnecessary where employer agrees not to violate in the future). IBP is also not currently in compliance. We, therefore, conclude that an order enjoining IBP from future violations of sections 15(a)(2) and 15(a)(5) of the FLSA, as amended 29 U.S.C. § 201 *et seq.* is appropriate.

IT IS THEREFORE ORDERED that defendant IBP is hereby enjoined from future violations of the FLSA, 29 U.S.C. § 201 et seq., in accordance with this opinion.

IT IS FURTHER ORDERED that defendant IBP is enjoined from withholding all back pay which was earned during the relevant period. The amount of back pay due will be determined during phase two of this litigation.[19]

### MEMORANDUM AND ORDER

This matter is before the court on defendant IBP's motion to modify or amend the court's Memorandum and Order entered April 28, 1993 (Doc. # 161). IBP seeks rescission of the permanent injunction arguing that the court was premature in entering the injunction against future violations by IBP. IBP contends that the court could not determine whether IBP is presently in compliance because the scope of the evidence presented at trial was limited to the period from April 1, 1986, to August 1, 1988 (the "relevant period"). Although, as plaintiff points out, there was evidence at trial regarding IBP's present policies, the first phase of the trial was limited to the issue of compensability during the relevant period. Accordingly, out of an abundance of caution, the court will vacate the permanent injunction and defer ruling on the issue.

IBP also challenges the portion of the order enjoining IBP from withholding back pay. The court notes that IBP was the party which raised the issue of the propriety of back pay during the first phase of the litigation. The issue having been resolved against IBP, IBP now contends that the court was premature in entering the injunction because the court has not yet heard evidence on the *de minimus* issue. Nevertheless, the court has decided to vacate the portion of the April 28, 1993, order enjoining defendant from withholding back pay. The decision that retroactive application is required will remain intact.

■ Vacating both injunctions eliminates defendant's right to appeal under 28 U.S.C. § 1292(a). However, the court is of the opinion that, pursuant to 28 U.S.C. § 1292(b), the following are controlling questions of law in this case: 1) whether the time spent donning, removing, and cleaning the "unique" personal protective gear worn by IBP production employees who used knives was "hours worked" under the FLSA; 2) whether the time spent donning, removing, picking up, and depositing for laundering sanitary outergarments was "hours worked" under the FLSA; 3) whether the wait and walk time related to the above issues was "hours worked" under the FLSA; and 4) whether, notwithstanding federal common law principles, the court's decision that the time at issue was "hours

---

**19.** Although there are no formal pleadings before the court at this time on the issue of certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), the court would have no difficulty in granting such a request.

worked" under the FLSA must be applied retroactively in light of 29 U.S.C. § 259. The court believes that there are substantial grounds for difference of opinion concerning the court's rulings on these issues and that an immediate appeal may materially advance the ultimate termination of this litigation.

IT IS THEREFORE ORDERED that defendant's motion to modify or amend the April 28, 1993, order (Doc. # 163) is granted.

IT IS FURTHER ORDERED that the portion of the court's April 28, 1993, order permanently enjoining future violations of the FLSA be vacated.

IT IS FURTHER ORDERED that the portion of the court's April 28, 1993, order enjoining defendant from withholding back pay be vacated.